THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DAVID ANDERSON, Plaintiff in Error.

*Opinion filed February 19, 1909—Rehearing denied April 8, 1909.*

1. CRIMINAL LAW—*when motion for a separate trial comes too late.* A motion for a separate trial is properly overruled as coming too late where it is not made until after the jury has been sworn and does not appear to be based upon any ground not known to the defendant before the jury were sworn.

2. SAME—*when statements by the co-defendants are admissible.* Upon the trial of several persons for murder, statements made by two of the defendants tending to show their guilt as charged in the indictment are admissible against them; but if there is anything in such statements indicating the guilt of the other defendants without tending to show the guilt of those making the statements, that part of the statements is not admissible.

3. SAME—*when action of court in admitting improper evidence cannot be considered.* The action of the court in admitting improper evidence in a criminal case cannot be considered by the SupremeCourt, where no question as to the matter was raised in the trial court by objecting to the evidence, moving to exclude it, or otherwise.

4. INSTRUCTIONS—*term "legal evidence" does not need explanation.* An instruction in a murder trial requiring a conviction if there was sufficient legal evidence to show the guilt of the defendant beyond a reasonable doubt, and stating that circumstantial evidence is legal evidence, is not objectionable because the term "legal evidence" is not explained, where other instructions require the jury to consider all the evidence and to acquit the accused if there is a reasonable doubt of his guilt.

5. SAME—*when instruction stating how intent may be shown is not obscure.* An instruction stating that the intent alleged in the indictment may be inferred from the facts proven is not obscure, upon the ground that the word "intent" does not appear in the indictment, where the indictment charges that the defendants "unlawfully, feloniously and of their malice aforethought did kill," etc., and other instructions state that malice, as used in the indictment, means a deliberate intention to unlawfully take the life of a human being.

6. SAME—*when instruction as to rule where two or more persons are engaged in a felony is proper.* Upon the trial of several persons for murder, an instruction is proper which states that "if two or more persons are engaged in the prosecution of a felony, the

acts of each in the prosecution of such felony are binding upon all, and all are equally responsible for the acts of each in the prosecution of such felony."

7. SAME—*conviction may be had notwithstanding proof of good character.* An instruction stating that a conviction may be had, notwithstanding the proof of the defendant's good character, if the jury are, from all the evidence, satisfied, beyond a reasonable doubt, of his guilt, is proper, even though the evidence of good character is made to appear by stipulation instead of being taken in the usual way.

8. SAME—*harmless error in instructions will not reverse.* Error in instructions in failing to properly limit the application of the confessions of certain defendants is not ground for reversal if the competent evidence as to the charge against defendant who is prosecuting the writ of error leaves no doubt whatever of his guilt.

9. STIPULATIONS—*when parties cannot complain that the court acted on stipulation.* Where the parties enter into an agreement in reference to the course to be pursued in any particular litigation they will not afterwards be heard to complain that the court acted on the stipulation, unless, as the result of so doing, the court has exercised, or attempted to exercise, jurisdiction not given by law.

10. APPEALS AND ERRORS—*failure of counsel to preserve questions does not change law as to review of record.* Failure of counsel in the trial court to exercise care and skill to preserve material questions for review does not change the law pertaining to the review of the records of *nisi prius* tribunals, and is not ground for refusing to affirm a judgment of conviction, even though the punishment fixed by the verdict is death.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM H. McSURELY, Judge, presiding.

On January 9, 1908, David Anderson, John Dennin and Joseph Lemke were jointly indicted by the grand jury of Cook county for the murder of Michael D. Callaghan, a police officer of the city of Chicago. Upon a trial in the criminal court of that county Anderson and Dennin were found guilty by a jury, which fixed the punishment of Anderson at death and that of Dennin at imprisonment in the penitentiary for life. During the progress of the trial

Lemke withdrew his plea of not guilty and entered a plea of guilty. Dennin secured a new trial. He then entered a plea of guilty and was sentenced by the court to fourteen years in the penitentiary. The motion of Anderson for a new trial was overruled, and to review the judgment of the court imposing sentence upon him in accordance with the verdict he has sued out this writ of error.

Anderson, Dennin, Lemke and Albert McCagg spent the latter part of the afternoon and the early part of the night of January 3, 1908, in McCagg's room on West Madison street, near the intersection of May street, in Chicago. Soon after darkness fell the four of them left the room and went out on the street. When they reached the street McCagg and Anderson walked ahead and Dennin and Lemke followed at a distance of about a block. Going west on Washington boulevard they approached Hoyne avenue. Anderson and McCagg were then on the south side of Washington while Dennin and Lemke were on the other side and some distance behind. When Anderson and McCagg reached the south-east corner of the intersection of Washington and Hoyne they angled across to the northwest corner of that intersection and started to go north on the west side of Hoyne. As they turned directly north Dennin and Lemke reached the north-east corner of the intersection, and just then Anderson and McCagg, or at least the latter, was stopped and accosted by Callaghan, who was in plain clothes. Several revolver shots were fired almost immediately. Either McCagg or Anderson, at the moment they met Callaghan, had a revolver. From that revolver three shots were fired and the officer fired at least one shot from the revolver he had. The shots inflicted mortal wounds upon Callaghan and McCagg. Anderson was unharmed. Anderson, Dennin and Lemke were arrested on the same night and taken to the Warren avenue police station. Upon the trial there was introduced in evidence a written statement alleged to have been signed by Anderson

at the station on the evening of January 4, 1908. That statement reads as follows, to-wit:

"I, David Anderson, hereby freely and voluntarily make the following statement: About one o'clock P. M., yesterday, January. 3, 1908, I met Joe Lemke at the St. Paul railroad station at Artesian avenue and Kinzie street. We caught a coach and rode down to Washington street. From there we went over to Canal and Madison street, where we waited for the one o'clock paper. When the paper came I bought a *Daily News* and looked over the miscellaneous advertisements. After that I walked west on Madison street to Bert McCagg's room, which was near May street. In the room we met Bert McCagg and a fellow with a brown mustache, whom they called Jack. We remained in the room for two or three hours and played cards. Then Bert and I went out and bought a coffee cake, one-half a dozen rolls and ten cents' worth of coffee, which we took back to the room, and the four of us, together with another fellow who came in they called the Swede, ate the lunch. After we ate the lunch Jack told us he was going to rob George Barker's house some night while the family was at the theater. He also told us that he had served nine years in a western penitentiary for robbery. After that the four of us, Bert McCagg, Joe Lemke, Jack and myself, started out to see what we could get. Jack had a gun with him. When we reached the foot of the stairs he gave the gun to Bert McCagg. We walked west on Madison street to Wood street, on Wood street to Warren avenue, on Warren avenue to Robey street. When on Robey street, between Warren avenue and Washington boulevard, I took the gun. We walked north on Robey street to Washington boulevard, west on Washington boulevard to Hoyne avenue. Bert and I was together and about a half a block ahead of Jack and Joe. At Hoyne avenue Bert and I cut across the street from the south-east to the north-west corner of Hoyne avenue and Washington boulevard, when we met an officer in

plain clothes, who stopped McCagg. I walked on down to
the foot of the stairs that was in front of the house, and
stopped. I had my gun in my hand. I heard the officer
ask McCagg where he was going. McCagg said something
to the officer that I did not understand. I then heard a
shot fired. I do not know whether I fired the shot or not,
but I started to run, and as I did I fired two shots in the
direction of the officer. While running, I fell. Then I got
up and ran west in the alley between Park avenue and
Washington boulevard, to Leavitt street. Then I went to
Lake street, walked west on Lake street to Campbell ave-
nue, south on Campbell avenue to the alley, where I hid
my gun and some extra cartridges which I had. I then
went into my house and remained there until arrested by
the officers. When we started out last night we intended
to get some money, no matter what we would have to do
to get it. The above statement is true and correct, is made
by me without fear or favor, hope or promise of reward
of any kind."

Edward S. Day, an assistant State's attorney of Cook
county, testified that he was at the Warren avenue station
on the morning of January 5, 1908, and there saw Ander-
son; that he asked Anderson if he wanted to tell him
(Day) about the matters involved in this case; that An-
derson replied in the affirmative; that Day cautioned him
that anything said might be used against him as evidence
on the trial; that Anderson said that he desired to tell
everything about it; that he then made a verbal statement
which was substantially the same as the written recital above
set out, except that he stated the facts relative to firing the
shots a little more in detail. As he related the matter to
Day, according to the testimony of the latter, he said that
when Callaghan stopped McCagg he (Anderson) stepped
off a few feet to the north. As he went in that way he
heard the first shot but did not know whether it came from
the revolver in his hand. He then turned, and with his

face toward McCagg and the officer started walking back-
ward, going north on Hoyne avenue; that as he did so he
rested his revolver over one arm and fired two shots at the
officer. At the time this statement was made to Day, John
R. McCabe, an attorney at law, who was then city clerk of
the city of Chicago, was present. His testimony in refer-
ence to what Anderson said to Day, as well as the testi-
mony of several police officers who were present at the time,
is, in effect, the same as the testimony of Day.

James Monaghan testified that on the evening of the
shooting he was a police officer; that he and Callaghan,
both in plain clothes, were walking south in Hoyne avenue,
detailed to look for suspicious characters; that about two
blocks north of Washington boulevard he stopped to speak
with a friend while Callaghan proceeded on south; that
when he heard the shots fired he ran south, and as he
did so he saw Anderson, whom, however, he did not know,
turn off of Hoyne avenue and run west in an alley north
of Washington boulevard. He followed him into the alley
and then fired several shots at him while Anderson was run-
ning west in the alley, but did not hit him and was unable
to overtake him. He then returned to the scene of the
shooting and found McCagg on his back on the sidewalk
with Callaghan holding him by the throat.

Walter S. Davis, a packer for Sears, Roebuck & Co.,
testified that shortly after eight o'clock on the evening of
January 3 he was walking north on Hoyne avenue; that
just north of Washington boulevard he met a man, who
was evidently Callaghan, going south; that when this man
reached the intersection of Washington boulevard and
Hoyne avenue he heard a shot fired and looked around;
that he (Davis) was then about twenty feet north of the
corner; that as he looked around he saw one man, who was
evidently McCagg, drop to the ground and at the same
time scream in agony; that at the same moment a man,
who was evidently Anderson, was running north from the

corner, and that as he did so he turned and fired twice at the two men at the corner, and that Anderson, passing on north, turned into an alley running west; that as Anderson ran north Callaghan fired one shot at him; that a little later he (Davis) approached the corner and Callaghan and McCagg were then both down on the sidewalk.

Dennin testified in his own behalf that the party left McCagg's room at Anderson's suggestion; that the revolver, which was the only revolver in the party, was his (Dennin's) revolver; that a couple of weeks earlier McCagg had talked about buying the revolver and that Dennin had then taken it to his room and left it there; that during the afternoon which the four spent in McCagg's room the revolver was lying on the dresser, and that he called Anderson's attention to it and stated that it was his (Dennin's) revolver; that when they reached the foot of the stairs after leaving McCagg's room, he (Dennin) and Lemke stopped a few moments at the foot of the stairs and then followed Anderson and McCagg; that he saw Callaghan, whom he did not know and whom he did not know to be an officer, accost McCagg and Anderson at Washington and Hoyne; that he then saw Anderson's arm moving and heard a shot, but that Anderson was at that moment standing with his back toward Dennin, so that the latter could not testify whether Anderson fired the shot; that Callaghan then caught hold of McCagg and swung him around between himself and Anderson, using McCagg as a shield; that after McCagg was so thrown around in front of Callaghan another shot was fired, but that he could not tell from what direction that shot came; that after the shooting neither he nor Lemke went over to the corner where Callaghan and McCagg were, with the crowd that immediately gathered there, but instead turned and walked south in Hoyne avenue.

Lemke, after his plea of guilty was entered and during the taking of testimony on the part of the defendants, was

called to the stand by the court. After his rights were ex-
plained to him he stated that he desired to testify in the
case, and he did so in response to questions propounded to
him by the court. He testified that he and Anderson went
to McCagg's room in company; that when the revolver
was shown to Anderson, in the afternoon, the latter said if
he had the price he could get some cartridges and go out
and get something; that McCagg said he would get the
money to get the cartridges with. Later a man by the
name of Sandborg, who roomed with McCagg, came in,
and McCagg borrowed some money of him, ostensibly to
buy lunch. Thereupon McCagg and Anderson took this
money and went out to buy the lunch. They were absent
about twenty minutes and returned with some food, which
was eaten there in the room; that the last time he (Lemke)
saw the revolver was about four or five minutes before they
left the room, when Anderson put it in his pocket; that
after the lunch was eaten Anderson proposed that they
should go out west and get something; that the four men
then left the room; that when they got to the foot of the
stairs either Anderson or McCagg suggested that they had
better separate, otherwise they might be stopped; that Mc-
Cagg and Anderson then walked away and Dennin and
Lemke followed at a distance of about a half a block; that
when Anderson and McCagg reached the north-west cor-
ner of the intersection of Hoyne and Washington, Dennin
and Lemke were just about at the north-east corner of that
intersection; that upon the firing of the shots Dennin and
Lemke turned and walked south on Hoyne avenue and
did not approach the point at which the shooting occurred,
Dennin saying, "Don't run; no use running;" that at the
moment when McCagg and Anderson met Callaghan at the
north-west corner of the intersection there was no one else
on that corner; that Anderson did the shooting; that three
shots were fired by him; that when he fired those shots he
was standing north of McCagg and Callaghan and facing

south; that he (Lemke) saw the flashes of the shots; that McCagg at the time of the flashes was south of Anderson, facing the west; that the officer was south of Anderson, facing the north; that the flashes passed from Anderson south toward McCagg and Callaghan, who were close together; that the three shots followed each other rapidly; that there was a fourth shot fired, which was fired by Callaghan; that Anderson then ran north while Callaghan and McCagg were engaged in a scuffle.

Anderson testified in his own behalf, and denied signing the written confession and denied making the material part of the statement to Day. He testified that when he and McCagg met Callaghan he (Anderson) did not know the latter to be an officer; that Callaghan approached them with a revolver in his hand pointed at Anderson and told them to throw up their hands; that he (Anderson) knocked the revolver aside, when it went off and immediately afterward McCagg screamed; that he (Anderson) then stepped backward, and McCagg said, "Don't you shoot;" that McCagg then took the revolver from his pocket and fired toward the officer; that the officer then dropped on his knees and McCagg fell down on the sidewalk and dropped his revolver; that a little fellow then came running along the street from the north and fired four shots from a revolver in the direction of the three men on the corner; that he did not know whether the man so firing from the north was an officer or not; that "he seemed a little fellow,—he looked merely a kid;" that when this man began firing from the north Anderson picked up the revolver which McCagg had dropped and fired two shots in the direction of the man coming from the north but not directly at him, and the man then turned and ran back, and that he (Anderson) then went north to the alley, passed through that to the west, and after hiding the revolver went home.

Callaghan was killed by a shot which entered his abdomen near the navel. There was at least one wound in

McCagg's back. The corner where the shooting occurred was at the time thereof brightly lighted. Anderson was nineteen years of age and had been convicted of a felony, for which he had served a term in the Pontiac reformatory. After his discharge he had been employed in several different occupations, but principally as a patrolman for a railway company. Dennin was twenty-seven years of age and was a teamster. When a boy he had served a term in the Folsom penitentiary, in California, for a felony. Lemke was twenty-five years of age and was a freight handler and switch tender. McCagg was a young man and had been working for Barker & Co., who were in the express business. All four resided on the west side, in the city of Chicago, and were at this time without money. After Anderson's arrest the police found the revolver which he had used, in the place in which he told them he had hidden it.

Anderson has assigned a number of errors which will sufficiently appear from the following opinion.

HERREN & STANDIDGE, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (JOEL C. FITCH, and JOHN T. FLEMING, of counsel,) for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Anderson denied that he signed the written statement above set out. When it was ready to be signed, according to the evidence for the prosecution, the police sent out for persons not connected with the police department to witness Anderson's signature, and brought in W. L. Normandine, a deputy sheriff serving in the municipal court, and a man by the name of Campbell. The latter was not called as a witness and it appears that he was out of the State at the time the case was tried. Normandine was called, and

testified that he was acquainted with Anderson and saw him in the police station on the occasion in question; that after he reached there he was given the statement and read it over; that Fitzgerald, the police officer who reduced the statement to writing, then asked Anderson to read it. Anderson said, "No; you read it." Fitzgerald then read it aloud and asked Anderson if it was all right. Anderson answered "yes; that he made no objection to anything that was read and that it was his statement." Normandine testified that, in response to questions asked by him at the time, Anderson said that he did not make the statement under any coercion; that he made it of his own free will; that he had not been promised immunity; that he had not been abused or treated unkindly by the officers at the station and that he made the statement because he wanted to. On cross-examination Normandine said that he asked these questions of Anderson because he thought probably the police "abused persons like that when they wanted a confession from them;" that Anderson, at the time, "was very cool and collected and there did not seem to be anything bothering him at all."

In addition to that, Fitzgerald, Mulhearn, McSwiggen and Healy, police officers, testified in reference to the making and signing of this statement. It appears from their testimony that the statement was freely and voluntarily made and signed, without any promise of leniency on account thereof. Normandine, Campbell and two police officers signed as witnesses to Anderson's signature. Anderson also denied the essential parts of the statement which he is said to have made to Day. Lemke swears positively that Anderson fired the fatal shot. Nothing else is consistent with the testimony of Davis and Dennin, and from Anderson's statements, written and oral, it appears that this must be so. It is true that he says by his statements that he does not know whether the first shot he heard was from the revolver which he had in his hand, but McCagg did not

then have a revolver in his possession. If the first shot which he heard did not come from the revolver which he had in his hand it could only have come from Callaghan's revolver, and there is not the slightest indication in the case that the wound from which Callaghan died was self-inflicted. It necessarily follows that the shot which killed Callaghan was one of the shots which Anderson fired. If Callaghan swung McCagg around in front of him for the purpose of using him as a shield when Anderson was firing, as Dennin testified, the result of this maneuver was to place McCagg with his back toward Anderson and to leave Callaghan with his face toward Anderson. In the course of this movement, if it was made, Callaghan was in a position to receive from Anderson's revolver the shot in his abdomen and McCagg was in a position to receive from the same weapon the wound in his back. Anderson's statement that a "little fellow" came running down the avenue from the north, firing at the three men on the corner, and that he (Anderson) picked up the revolver for the purpose of firing toward the little fellow, is manifestly a pure invention, made necessary on the trial for the purpose of explaining how Anderson came to have possession of the revolver which the police had already found at the place at which Anderson had told them he had hidden it. According to Anderson's testimony on the trial there was no purpose whatever in picking up the revolver and firing it except to repel the attack of the man who came from the north. No other of several persons who were eye-witnesses to the shooting saw the "little fellow" shooting in Hoyne avenue. To us it is clear and certain, upon consideration of competent evidence offered against Anderson and upon consideration of testimony offered in his favor, that he (Anderson) fired the shot at Callaghan which killed the latter, under circumstances which make the act of Anderson murder.

It is complained that the court erred in refusing to grant Anderson a separate trial. The only motion for a

separate trial shown by the bill of exceptions is one made after the jury were sworn. It does not appear that it was based on any ground not known to plaintiff in error when the jury were called into the box. It is certain that in the absence of a showing that something had come to Anderson's knowledge after the jury were sworn which afforded a basis for a separate trial, the motion was properly overruled on the ground that it came too late. (*Hullinger* v. *State,* 25 Ohio St. 441; *State* v. *Mason,* 19 Wash. 94; *Nichols* v. *Territory,* 3 Okla. 622; *State* v. *McLane,* 15 Nev. 345.) What the rights of Anderson would have been had it appeared that the motion was based on such newly acquired information is not for our determination.

While Dennin and Lemke were confined at the police station each made a written statement, which, in substance, was the same as the testimony of Lemke given on the trial and recited in the foregoing statement of facts, except that each of such statements made at the police station showed more clearly that when the four men were upon the street after leaving the room they were acting in concert for the purpose of obtaining money by highway robbery. These were admitted in evidence, and it is urged that this was error. Each of those statements tended to show guilt, as charged in the indictment, on the part of the man who made it, and both of the men who made the statements were on trial when the statements were offered. It is, of course, true that one of several co-defendants charged with a crime cannot make a statement exonerating himself and fastening the crime upon another co-defendant, and thereby make the statement admissible on the theory that it is a confession of the defendant making it. No man can confess for any one but himself. As above indicated, however, each statement contained admissions of fact which the jury might rightfully regard as tending to show the guilt of the man making the statement. If there was in either statement anything the effect of which was to indicate the

guilt of Anderson without tending to show the guilt of the man making the statement, that part of the statement was not properly admissible in this case where Anderson was on trial. There is no part of either statement which could have been excluded on that theory. Each of the written recitals was properly admitted in evidence as against the man making it.

Dennin and Lemke both testified at the coroner's inquest upon the body of Callaghan. The prosecution in this case proved what each said there, by taking the testimony of the deputy coroner who conducted the inquest and of a stenographer who took the testimony there. The prosecutor by the usual method showed this evidence to be within the rule announced in *Lyons* v. *People*, 137 Ill. 602, and that being so, it was proper to prove against either of the two men, Dennin and Lemke, what he had said before the coroner. Objection was interposed as to the manner in which proof was made in the criminal court of the statements which had been made before the coroner. This evidence could not be considered against Anderson and he was not injured by the method pursued in its introduction.

It is also insisted that the court erred in calling and examining Lemke, and complaint is made of certain questions propounded to and answers made by Lemke. No objection was taken in the trial court to this action of the court nor to any of the testimony of this witness.

In cross-examining Monaghan, the attorney for Lemke elicited the fact that he (Monaghan) was at the county hospital after McCagg was taken there and that he asked McCagg who shot him, and McCagg replied "Dave." No objection was made and no motion was interposed to strike out the answer. Following that, when Captain Healy was on the stand he testified, in response to questions propounded by the prosecutor, that McCagg, after he reached the hospital, stated that it was Anderson who shot him. To this no objection was made and there was no motion to

strike.  Captain Healy also testified that thereafter Anderson was taken to the hospital and brought into the presence of McCagg; that the latter then stated, "That is Dave,—that is the man who shot me."  There was no objection and no motion to strike.  Again, on cross-examination of Anderson the fact was elicited that he was taken to the hospital and into McCagg's presence shortly before McCagg's death; that he was ushered in between two police officers, to both of whom he was handcuffed; that a police officer inquired of McCagg, who was lying on his back, who the man was that shot him, and McCagg raised his hand and made a motion toward Anderson and the policemen to whom he was handcuffed, as though indicating them, or some one of them, in response to the question.  Again no objection was made and no motion was interposed to strike.  All the evidence taken tending to show that McCagg said or indicated, after he reached the hospital, that Anderson shot him was highly improper, but it is scarcely necessary to say that in the absence of any question about the matter raised in the trial court there is nothing for us to consider.  It may be observed that in this particular case there is no basis for any presumption or contention that Anderson designedly shot McCagg.  If he did, in fact, inflict a wound upon him it was evidently done in an attempt to shoot the officer.

. When the confessions of Dennin and Lemke were offered, the court ruled, in substance, that the statement made by each was admissible only as to the charge against him and that the matter could be properly limited by instructions.  The instructions which were given to the jury at the request of the prosecution in reference to these statements were inaccurate and incomplete, and they were not cured by those given at the request of the accused.

People's instruction No. 60 was to the effect that the law required a conviction where there was sufficient legal evidence to show the guilt of the defendant beyond a reasonable doubt, and that circumstantial evidence is legal evi-

dence. It is said that the jury might, under this instruction, consider only the evidence against defendant which might be sufficient to show his guilt and thereon found a conviction, although a consideration of all the evidence would leave in their minds a reasonable doubt as to his guilt. The jury were advised by several instructions that it was their duty to consider all the evidence introduced by the respective parties. They were also instructed that after having considered the evidence on both sides of the case, if any reasonable doubt remained of the guilt of Anderson they should acquit him. We think the instruction, as one of the series, was not misleading.

It is also complained that the jury should have been more carefully advised by this instruction in regard to the meaning of the term "legal evidence." We think any man competent to serve on a jury would understand that the term "legal evidence" meant any evidence that the jury had the right to consider.

The objection to the People's instruction No. 61 was held in *People* v. *Zajicek,* 233 Ill. 198, to be without merit. People's instruction No. 71 is questioned. It advises the jury that the intent alleged in the indictment may be inferred from the facts and circumstances shown by the evidence. The word "intent" does not appear in the indictment, and it is argued that the jurors cannot be said to have known what was meant by the word as it thus appears in the instruction. The indictment charges that the defendants "unlawfully, feloniously and of their malice aforethought did kill," etc. The jury were advised by other instructions that malice, as used in the indictment, meant a deliberate intention to unlawfully take away the life of a human being. It would seem that, considering the instructions as a series, the jury would understand the meaning of the word "intent" as used in the instruction now under consideration.

It is also said that this instruction assumes that the assault charged in the indictment was made. An examination of the instruction leads us to the conclusion that this contention results from a misapprehension of its meaning.

Instruction No. 56 given on the part of the People reads as follows:

"The court instructs the jury, as a matter of law, that if two or more persons are engaged in the prosecution of a felony, the acts of each in the prosecution of such felony are binding upon all, and all are equally responsible for the acts of each in the prosecution of such felony."

This states a fundamental principle often announced. We are unable to see any objection to it. It was pursuant to the law so stated that the prosecution contended that Dennin and Lemke were guilty.

People's instruction No. 58 advised the jury that notwithstanding the proof of Anderson's good character he might be convicted if the jury were, from all the evidence, satisfied, beyond a reasonable doubt, of his guilt. That instruction is identical in meaning with one which was approved by this court in *Hirschman* v. *People,* 101 Ill. 568.

For the purpose of expediting the trial and dispensing with the necessity of calling witnesses, counsel for Anderson and the prosecutor agreed that five witnesses, if present, would testify that Anderson's reputation for "honesty, integrity and truthfulness" was good. It is said that the instruction just referred to was particularly harmful on account of evidence of the good character of the accused having been made to appear by stipulation instead of having been taken in the usual manner. What element of harm could have resulted from this situation is not pointed out.

Instruction No. 62 given for the People was a definition of reasonable doubt which received the approval of this court in *Miller* v. *People,* 39 Ill. 457. The instructions, as a whole, stated the law fully and accurately, except in reference to limiting the application of the confessions made

by the various defendants. As above indicated, the competent evidence in this case as to the charge against Anderson leaves no doubt of his guilt. It is therefore clear that the error in the instructions in reference to the limitations to be placed upon the various confessions was harmless. Such being the case, that error does not warrant reversal. *Dacey* v. *People,* 116 Ill. 555, and cases cited.

It is also urged that the court erred in unduly hastening the trial. The evidence was all taken in two days. During the course of the trial, on the second day, the court stated, "We are going to finish the evidence to-night." When the hour of adjournment was reached, counsel for Anderson stated, in substance, that his evidence was all in, except that he wanted to put five character witnesses on the stand next morning. The court then stated that on account of the next day but one being Decoration Day he had desired to finish the evidence and he could go on at the time at which he was then speaking, but if counsel for Anderson desired he would adjourn until next morning. The prosecutor then offered to stipulate in reference to the testimony that the character witnesses would give. Counsel for Anderson accepted the offer, the stipulation was made and the court then adjourned until the next morning. Counsel who appear for Anderson in this court did not appear in this case in the criminal court. It is urged here that the court should not have permitted the stipulation to be made. In connection with this matter, and with the failure of counsel who appeared for Anderson in the trial court to preserve in that court the rights of Anderson with reference to certain matters deemed by present counsel for Anderson to be material, it is argued that a judgment should not be affirmed, where the punishment is death, if it appears that through the ignorance or mistake of counsel in the trial court the rights of the accused have not been preserved in such manner that material questions can by the ordinary rule be reviewed here. Failure of counsel in the trial court to exercise great

care and skill, if such failure occurs, will not change the law pertaining to the review of the records of *nisi prius* tribunals. Where parties enter into an agreement in reference to the course to be pursued in any particular litigation they will not afterwards be heard to complain that the court acted on the stipulation, except where, as the result of so doing, the court has exercised, or attempted to exercise, jurisdiction not given by law, as, for example, trying one charged with a felony without the intervention of a jury.

No error occurred in the trial court, that is open for consideration in this court, that could in any manner have influenced the jury to impose upon the defendant a severer penalty than that which they would have imposed had such error not intervened. The judgment of the criminal court will be affirmed.

The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of the 7th day of May, A. D. 1909, as the time when the original sentence of death entered in the criminal court shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of the county of Cook.

*Judgment affirmed.*