THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY SPENCER, Plaintiff in Error.

*Opinion filed June 16, 1914.*

1. CRIMINAL LAW—*corpus delicti may be proved by circumstantial evidence.* Circumstantial evidence may be resorted to for the purpose of proving the *corpus delicti* in the same way and to the same extent that it may be for the purpose of connecting the accused with the offense.

2. SAME—*when action of trial court in admitting evidence can not be considered by Supreme Court.* The action of the trial court in admitting evidence in a criminal case cannot be considered by the Supreme Court, where no question was raised on the trial by objecting to the evidence when offered, or by moving to exclude it, or otherwise.

3. SAME—*question of qualification of experts is largely within discretion of trial court.* The question of the qualification of expert witnesses rests largely in the discretion of the trial court and will not be reviewed except where there is a clear abuse of such discretion.

4. SAME—*when it is not error to admit testimony as to what a third person said to the witness.* It is not error to admit testimony by a police officer that a certain railroad employee stated to him, in the presence of the accused, that he recognized the accused as the man who came to the railroad station on a certain night with a lady and inquired about trains, even though the employee testifies on the trial that he was not sure he recognized the accused as the man but thought he looked like him, where the accused himself admitted he was there.

5. SAME—*when the statements of third persons are admissible.* Statements made by third persons, in the presence of the accused, connecting him with the crime charged against him, and which he does not deny but by his own actions and statements at the time expressly ratifies, are admissible in evidence against him.

6. SAME—*testimony of a witness who heard confession taken down is admissible.* A police officer who was present when the accused made a confession of his guilt, which was taken down in shorthand and afterwards transcribed in typewriting but not signed by the accused, may testify as to what was said by the accused with reference to the crime charged.

7. SAME—*when accused cannot complain that parts of his confession were excluded.* The accused cannot complain that parts of his confession concerning his commission of other crimes not in

any way connected with or tending to prove the crime charged were not allowed to go to the jury, where his counsel not only acquiesced in the action of the trial court at the time but demanded that the court should so rule.

8. SAME—*when part of confession relating to other crimes not admissible.* Where the accused, in confessing the crime charged, also confesses numerous other alleged crimes having no connection with the crime charged, the part of the confession relating to such crimes, if severable from the part relating to the crime charged, is not admissible, and it is not error, after motions for new trial and in arrest of judgment are overruled, to refuse to allow the accused to introduce such part of the confession on the theory that it would show he was insane.

9. SAME—*when the People are not required to prove sanity of accused.* Every man is presumed to be sane, and, in the absence of evidence of facts coming from either side which may raise a doubt as to the sanity of one accused of crime, the People are not required to prove his sanity.

10. SAME—*what facts are not necessarily evidence that the accused was insane.* The facts that the accused is shown to be of depraved character and abandoned habits and has committed an unnatural and atrocious crime do not necessarily amount to evidence of his insanity.

WRIT OF ERROR to the Circuit Court of DuPage county; the Hon. MAZZINI SLUSSER, Judge, presiding.

ANTON ZEMAN, OLIVER M. OLSON, and HARRY W. STANDIDGE, for plaintiff in error.

P. J. LUCEY, Attorney General, CHARLES W. HADLEY, State's Attorney, and GEORGE P. RAMSEY, (F. L. RATHJE, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

At the October term, 1913, of the circuit court of Du-Page county the grand jury returned an indictment against the plaintiff in error, Henry C. Spencer, for the murder of Mildred Allison, *alias* Mildred Rexroat. On a trial before a jury in that county a verdict of guilty was returned and his punishment fixed at death. After motions for new trial

and in arrest of judgment had been overruled he was sentenced to be hanged. The record is before us for review.

At about 8:23 o'clock in the evening of September 26, 1913, a freight train on the Elgin, Joliet and Eastern railroad running in a northerly direction was approaching Wayne, in DuPage county, when the engineer saw a dark object on the track ahead. He tried to stop the train but was unable to do so until after it had passed over the object. The train crew went back to the south to ascertain what they had struck, and a short distance south of the caboose they found the body of a woman cut in two just above the hips. On the upper part of the body was a blue jacket. A lady's large, blue hat and a pair of gold-rimmed spectacles were found in the vicinity, and a gold bracelet, marked "from W. H. A. to M. A.," was on one of the arms. The witnesses testified that the body was neither warm nor cold when found. They at once notified the officials of the railroad company and an undertaker at West Chicago. The undertaker, under direction of the coroner of DuPage county, took charge of the remains and removed them to his morgue at West Chicago. The next morning the coroner of the county found near the scene of the tragedy, close to the railroad track, a lady's white hand-bag turned inside out, with spots of blood on it. The Aurora, Elgin and Chicago Electric railway runs from Chicago westerly through various towns, and a little west of Wheaton, the county seat of DuPage county, one branch turns north-westerly towards Wayne. About thirty rods south-east of the station at Wayne it crosses on a viaduct over the tracks of the Elgin, Joliet and Eastern railroad. The dead body was just south of this viaduct. The remains were identified the day after they were found as the body of Mildred Allison Rexroat. She had been first married to W. H. Allison, by whom she had three sons. A few months before her death she had been divorced from Allison and shortly after married one Everett Rexroat. Allison's home was in

Chicago. Rexroat was from Macomb, Illinois, and the deceased had been with him there for a while but does not appear to have been living with him for some time previous to her death. Some time prior to September, 1913, and during that month, Mrs. Rexroat had been engaged as an instructor at a dancing academy owned by one Frank L. Oleson, at 459 East Thirty-first street, in Chicago. The evidence is to the effect that the plaintiff in error, Spencer, met Mrs. Rexroat at this dancing academy several days prior to September 26, 1913, he being at this academy taking lessons, and that he danced several evenings with Mrs. Rexroat as well as with some others there. Thursday evening, September 25, he was at the academy and danced almost exclusively with Mrs. Rexroat. Oleson, and at least two other witnesses, testified that on that evening, while Spencer and Mrs. Rexroat were together at the dancing academy, Mrs. Rexroat said, in Spencer's presence, that he had arranged for her to teach the tango to a class of young men which had been formed at Wayne. To one of these witnesses Mrs. Rexroat, in Spencer's presence, said that she was to receive $15 a night and her hotel bill, and this lady said that she would be glad to go as Mrs. Rexroat's assistant, but the latter replied that she did not need any just then; that Spencer was going to take one night in small towns, naming Wayne and several other places. At the close of the evening's dancing Spencer, Mrs. Rexroat and Carl White left the dance hall together and went to a neighboring cafe and drank four bottles of beer among them, and there again Mrs. Rexroat stated to White, in Spencer's presence, that the latter had arranged for her to teach a class in dancing out at Wayne. All of these witnesses identified Spencer positively.

Mrs. Rexroat was rooming, at this time, with Mrs. Ada Johnson, on Eggleston avenue, in Chicago. At about 3:30 o'clock P. M. on the day she met her death Mrs. Rexroat packed a rattan suit-case and left her boarding place. She

wore at that time a dark-blue suit, a new, large hat, short, white gloves, a bracelet, diamond ring, Tiffany setting, earrings, another ring with small stones, a small brooch, and spectacles. She carried a white hand-bag and the rattan suit-case. The diamond ring had been given her by Everett Rexroat, her husband, and he testified it cost him $300. The white hand-bag, hat, suit and bracelet found at the scene of the tragedy were identified by Mrs. Johnson as the articles Mrs. Rexroat wore or carried when she left her house the afternoon of September 26. About six o'clock the same evening a man and woman resembling, according to the witnesses' testimony, Spencer and Mrs. Rexroat, and carrying a rattan suit-case, appeared at the Fifth avenue station of the Aurora, Elgin and Chicago Railroad Company, in Chicago. The lady wore a large hat and a dark-blue suit. They were told by the man in charge of the six o'clock train that it did not stop at Wayne,—that the first train stopping there would leave at 6:30 P. M. This last mentioned train was in charge of Hugh Cargo and left at the proper time. Cargo testified that Spencer and a lady answering the description of Mrs. Rexroat were on his train on that trip and were seated in the third seat from the rear, in the first car. C. A. Goodwin, a resident of Wheaton, sat in front of them and heard them talking about the tango dance and how it should be taught, also about a diamond and about the will of the man's father. Cargo and Goodwin both identified this man as Spencer. About 7:25 P. M. the man came to Cargo, who was in the second car from the front of the train, and asked the latter to be sure not to carry him past Wayne. The conductor told him that it was then 7:25 and that they would be at Wayne at 7:45. The two rear cars of this train were cut off at Wheaton and the first car went on to Elgin with conductor Cargo in charge. The car arrived at Wayne on time and Spencer and the lady left the car there. Two other passengers got off the car,—a man whose identity is

not shown by the record, and Mrs. Louisa Pratt, who lived
at Wayne. She testified that she could not identify Spencer
as the man who got off with the other lady, as she did not
see the man's face, but the description she gave of the lady
fitted Mrs. Rexroat, so far as it went. At the station of the
Aurora, Elgin and Chicago Railroad Company at Wayne
its tracks are crossed by a public highway running east
and west. The electric road runs in a north-westerly direc-
tion, the Elgin, Joliet and Eastern railroad running prac-
tically north and south. The highway, after crossing the
electric railway, crosses the right of way of the Elgin, Joliet
and Eastern Railway Company about forty rods east of the
interurban station. Mrs. Pratt testified that the man and
woman she saw on the electric car alighted ahead of her at
Wayne at 7:45 P. M., walked south to the end of the sta-
tion platform, then walked east on the east and west high-
way, ahead of her, to the Elgin, Joliet and Eastern tracks,
and then walked south on the railroad tracks towards the
viaduct of the electric railway; that the two were laugh-
ing and talking. About five or six minutes after the wit-
ness had crossed the Elgin, Joliet and Eastern tracks she
heard what sounded like the report of a pistol shot coming
from the south,—the direction of the viaduct.

The car in charge of conductor Cargo went to Elgin
and returned, arriving at Wayne about 8:12 P. M. The
conductor testified that one passenger boarded his car there
on its return trip to Chicago. At Wheaton, Cargo was
relieved by conductor C. S. Croumer, who took the car on
to Chicago. Croumer testified that Spencer was on his car
on that run; that he had to wake him up to get his ticket;
that the car arrived at Chicago at 9:30 P. M. At about
10:15 the same evening Spencer appeared at 2215 Michigan
avenue, the home of W. R. Patterson, with whom he had
been acquainted for about eight years, being known to Pat-
terson by the name of Burke. Mr. and Mrs. Patterson were
at home at the time. Mrs. Patterson asked Spencer what
264 — 9

was the matter, stating, "You look as white as a sheet."
Spencer replied that there was nothing the matter with him,
but went over to the looking glass and looked at himself.
He said, "I feel like a bum; do I look dirty?" and looked
at his hands. Mr. Patterson said "No" but spoke of the
dirt on his shoes. Spencer replied that it was not Chicago
dirt but came off the country road, and taking a handker-
chief from his pocket dusted his shoes. During the con-
versation he took a lady's solitaire diamond ring, Tiffany
setting, from his pocket, wrapped in a lady's handkerchief,
and showed it to the Pattersons, remarking on its beauty.
This diamond ring answered the description of the one be-
longing to Mrs. Rexroat and worn by her when she left
Mrs. Johnson's. Her diamond ring was not found on her
remains. Spencer handed the ring to Mrs. Patterson, and
she asked him if he wanted to sell it. He replied that he
would take $100 for it. Mrs. Patterson told him she did
not have the money at that time for the ring, and Spencer
said that if she did not want it he would sell it the follow-
ing day, anyway. He then took it, slipped it on his tie
and again went to the looking glass, and said, "Isn't it
a beauty?" He then took off the ring, wrapped it in the
handkerchief and put it back into his pocket. The ring was
not seen or found in his possession afterward. After some
further conversation Spencer felt in his pocket and pulled
out a newspaper, unfolded it and took out a blue-steel
38-caliber revolver and took an empty shell out, which he
threw from the window, stating that he was just throw-
ing out a dead shell. He appeared again at the Patterson
home the following Monday night. Mrs. Patterson, who
was at home alone, asked, "Who is there?" and he replied,
"Burke." She let him in and noticed that he ran his hands
through his hair and had his glasses in his pocket. Before
that she testified he had always worn his glasses. After he
got into the room he put them on. There were some news-
papers on the table, and he said to Mrs. Patterson, "You

seem to be interested in the tango case." She replied she was. Mr. Patterson came home soon and he had other papers with him and laid them on the table. Spencer again remarked, "I see you are interested in the tango case." Patterson replied, "Yes, and that description fits you pretty good, Henry; you better look out or they will grab you up for that." Spencer replied, "Oh! no, there is no danger of anything like that; they are looking for a tall man." On the following Saturday, October 4, Spencer met Mrs. Patterson at a dime theater on State street, in Chicago. After she saw him he motioned to her and she went over and sat down by him. She testified that while the moving picture show was going on and the room was darkened Spencer wore his glasses; when the lights were turned on he would remove them. After a little time he stated that he had seen that show and suggested that they had better go out, which they did. He asked her to go over with him to the Lake Front, and when she refused, at his request they went to a chop suey restaurant for lunch. She asked him there what he had done with the ring, and he replied that he had sold it. She testified that about that time he looked at her and said, "Now, you and Patterson ain't no fools, and if you say a word about this I will send you both the same route." On Sunday night, October 5, Spencer again appeared at the Patterson flat, where Capt. Halpin and two other officers were apparently lying in wait for him, and he was there arrested.

September 23, 1913, Spencer had rented a room of a Mrs. Schofield, at 3212 Rhodes avenue, Chicago. He did not appear there again until September 26, at about eight o'clock A. M., when he left his grip and went away at once. Mrs. Schofield did not see him again until the next morning, but she testified that he had occupied his room some time during the night of September 26 and for several nights thereafter. After he was arrested at the Pattersons' on the evening of October 5 Capt. Halpin took him

to the Schofield place. Spencer's room there was searched, and in the lower dresser drawer a 38-caliber blue-steel revolver, with three loads, was found, as was also a rattan suit-case and a lady's handkerchief. The suit-case was identified by Wade Hudson as being one that he had loaned W. H. Allison in the early part of September, 1913. Allison testified that the suit-case that he borrowed of Hudson he had left with his former wife, Mildred Rexroat. Allison was not positive that the suit-case in question was the one he borrowed from Hudson but said it looked like it. He identified the bracelet found on Mrs. Rexroat's wrist as one he had given her.

Shortly after his arrest Capt. Halpin took Spencer to the police station in Chicago. He asked Spencer if he wished to say anything, and at the same time stated to him that anything he might say would be used against him upon the trial of the case. Other officers testified to the same effect. No promises or threats of any kind were made to Spencer. Spencer said that he was willing to tell all that he had done. According to the testimony of Halpin and the others who were present, Spencer then narrated the facts with reference to his meeting Mrs. Rexroat, dancing with her, arranging with her to teach a tango class at Wayne, going with her on the electric line to Wayne, returning on the electric line to Chicago, going to the Pattersons. He also gave the conversation with Mr. and Mrs. Patterson about the diamond ring substantially as testified to by them, and further stated that when he and Mrs. Rexroat left the electric car at Wayne they walked east to the Elgin, Joliet and Eastern tracks, as he told her it was a short cut to his farm, which he claimed his father left him; that they then walked south under the viaduct of the electric line, he having hold of her right arm with his left hand; that shortly after passing under the viaduct he took the revolver out of his pocket and shot her in the jaw; that she fell without any outcry; that he then placed her body

across one of the tracks of the steam railway, took her suit-case and her diamond ring and went back and took the car to Chicago; that he threw various articles from the suit-case out of the car window on the way from Wayne to Chicago. A number of torn business cards marked with Mrs. Rexroat's name were found near the Wayne electric station the morning following. Later on, the same night, in Capt. Halpin's office, Spencer made practically the same statement in the presence of one of the assistant State's attorneys of Cook county, the State's attorney of DuPage county, and others. Before making the statement Spencer was again told that whatever he said would be used against him in court, and he replied that it was all right,—that he wanted to tell the truth. He also stated in his talk with Capt. Halpin and the others that he had met Mrs. Rexroat at Sans Souci Park before he met her at the dancing academy; that several times during their acquaintance she had come down town and stayed with him at various hotels.

Mrs. Johnson, with whom Mrs. Rexroat roomed, testified that just before Mrs. Rexroat left on Friday, September 26, there was a telephone call which Mrs. Rexroat could not understand over the telephone and Mrs. Johnson talked for her; that the person talking made an appointment to meet Mrs. Rexroat at the Fifth avenue station; that the next day (Saturday) a person having the same voice called Mrs. Johnson and told her that Mrs. Rexroat would not be back; that she was going away to marry the person who was talking over the telephone. Mrs. Johnson, after Spencer's arrest, met and talked with him, in Capt. Halpin's presence, in the police station. The testimony of both Capt. Halpin and Mrs. Johnson is that Spencer admitted to them that he was the person that talked with Mrs. Johnson over the telephone on both of these dates, and also admitted that he told her Mrs. Rexroat would not be back because she was going to marry him. He admitted also to Capt. Halpin that he had gone out to Wayne shortly

before the crime was committed, taking with him a hammer, which he placed by a telegraph pole beside the railroad track, near the scene of the crime, in order that he might use the hammer to kill Mrs. Rexroat in case he ran out of cartridges and could not kill her with the revolver. The hammer was found at this point several days after Mrs. Rexroat's death. At the time of his arrest Spencer had on his person $260 in money.

The post-mortem examination of the dead body was held at West Chicago on the afternoon of Saturday, September 27, being performed by Drs. W. L. Guild and Paul Isherwood and the coroner. This post-mortem disclosed a bullet wound in the right corner of the mouth of the deceased, which knocked out a tooth, ranged upward through the jaw and sphenoid bone, through the cortex and cerebrum, and through the parietal bone and out through the skull. No bullet was found. There was only one puncture of the scalp, and that was at the point where the bullet passed through the skull. The hair was matted with a great amount of blood, and blood was found in the mouth. The physicians testified that the wound through the head was the cause of the death of Mrs. Rexroat, and that she was dead when the train struck her, as there was no extravasation of blood where the body was lacerated by the wheels of the train. Capt. Halpin took Spencer on a trip to Wayne and asked the latter to point out where he claimed he killed Mrs. Rexroat and where he placed the hammer. Spencer pointed out the places, and we judge from the evidence that they corresponded with the actual facts as to the place where the body was found and the location of the hammer.

Plaintiff in error was put on the stand, and in answer to all of the many questions asked him, both upon direct and cross-examination, he answered, substantially, "I don't know." His counsel introduced no other testimony on his behalf. He stated in his confession that he did not know

who his parents were; that the first he remembered he was in the Home for the Friendless; that he served at least two terms in the penitentiary and one in the house of correction. What has been stated is, in substance, all of the testimony that was introduced and heard by the jury on the trial of the case. In his speech at the close of the trial, before sentence was pronounced, he claimed he had confessed to this murder because he was tired of spending his time in the penitentiary and had come to the conclusion that he would rather die, if taken up by the police for any reason whatever, than be sent to the penitentiary again.

Some question is raised as to whether the *corpus delicti* was properly proved. While confessions and admissions in themselves are not sufficient to convict without other proof, circumstantial evidence may be resorted to for the purpose of proving the *corpus delicti* in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense. It is seldom that either of these can be proved by direct testimony, and therefore they may be lawfully proved by circumstantial evidence, provided it is satisfactory. (3 Greenleaf on Evidence,—16th ed.—sec. 30; *People* v. *See,* 258 Ill. 152; *Carroll* v. *People,* 136 id. 456.) The circumstances proved in this record, about which there is no conflict in the testimony, satisfactorily proved the *corpus delicti* of the offense charged in the indictment without taking into consideration the confessions of plaintiff in error.

Counsel for plaintiff in error contend that the court erred in admitting the testimony of the coroner and certain doctors because it was not shown that they were qualified as experts, and also erred as to admitting certain of their testimony as to the character of the wound through the head and what caused it. The record does not show that any objection was made in the trial court as to either of these matters. The action of the trial court in admitting evidence in a criminal case cannot be considered in

this court where no question was raised on the trial, either by objecting to the evidence, moving to exclude it, or otherwise. (*People* v. *Anderson,* 239 Ill. 168; *People* v. *Nall,* 242 id. 284.) Moreover, we do not think the evidence was improper. The qualification of experts rests largely in the discretion of the trial court and can only be reviewed when there is a clear abuse of such discretion. (*People* v. *Jennings,* 252 Ill. 534; *Bonato* v. *Peabody Coal Co.* 248 id. 422.) That discretion was not improperly exercised on this question. Neither was the evidence given as to the character of the wound, and the instrument making it, inadmissible under the rules laid down by this court in *Cannon* v. *People,* 141 Ill. 270, *Siebert* v. *People,* 143 id. 571, *Hellyer* v. *People,* 186 id. 550, and *Lyons* v. *Chicago City Railway Co.* 258 id. 75.

Counsel for plaintiff in error further contend that the court erred in admitting the testimony of Capt. Halpin that Walter J. Blaser, an employee of the electric road, stated to him, in the presence of plaintiff in error, that he recognized Spencer as the man who came with a lady to the Fifth avenue electric station in Chicago on the evening of Friday, September 26, Blaser being the man who told the two that the train to Wayne did not go until 6:30. Blaser testified on the trial that he was not sure whether he recognized plaintiff in error as the man with the lady on the night in question, but that he thought he looked like him. There is no denial by anyone, however, of the fact that when Capt. Halpin brought plaintiff in error to Blaser before the trial, Blaser told the captain that he recognized plaintiff in error as the man who inquired about the train. It might well be urged that this question is not properly presented in the record, but conceding, for the purposes of the argument, that it was, we cannot see how this testimony injured plaintiff in error. Blaser and Halpin were both witnesses for the State. If they contradicted each other that would tend to lessen the weight of the testimony of one or

both of them with the jury. Then, too, it seems impossible that the jury were prejudiced by this testimony of Capt. Halpin. Spencer was recognized by several different persons as the man who went to Wayne with Mrs. Rexroat on the night in question. He himself admitted that in his confession. There is no evidence in the record that in any way contradicted that fact.

The argument of counsel for plaintiff in error that the court erred in permitting Capt. Halpin to testify that conductor Cargo identified plaintiff in error as the man who went on his train to Wayne with the lady on the evening of September 26 is without merit, as Cargo himself testified that he recognized the plaintiff in error as the man, and does not in any way question by his testimony that he did identify plaintiff in error in Halpin's presence.

Objection was also made to the testimony of Capt. Halpin and Mrs. Johnson as to what was said by them and by the plaintiff in error about the telephone conversations between Mrs. Johnson and plaintiff in error. This testimony was clearly admissible as bearing upon the issues involved. Plaintiff in error, by his actions and statements at the time, expressly ratified and adopted such statements as his own. (*People* v. *Tielke,* 259 Ill. 88; *People* v. *Pfanschmidt,* 262 id. 411.) The same must be said with reference to the evidence, now claimed as erroneous, as to what was said in plaintiff in error's presence concerning his identity and his conduct at the homes of the Pattersons and the Schofields.

The second time the plaintiff in error made a statement as to his connection with this crime to Capt. Halpin it is claimed by his counsel that this statement was taken down by a shorthand reporter and afterwards transcribed into typewriting. It is admitted that it was not signed by the plaintiff in error. Counsel, however, contend that the oral testimony of Capt. Halpin and others as to what was stated by plaintiff in error was incompetent,—that only the typewritten statement should have been admitted. This is not

the law. Even if the statement, after it had been written out, had been admitted to be correct by plaintiff in error and signed by him, still the oral testimony of those who heard his statement would have been admissible. The oral or written statements—either or both—under these circumstances are competent. If there is any exception to this general rule it is where the confession is made upon a hearing before a magistrate, who reduces it to writing and makes it a part of the record pursuant to some statute. 1 Greenleaf on Evidence, (16th ed.) sec. 227; *People* v. *Giro,* 197 N. Y. 152, and cases cited; see, also, *Guy* v. *State,* 9 Tex. Crim. App. 161; *State* v. *Wells,* 1 N. J. L. 486.

After motions for new trial and in arrest of judgment had been overruled by the court, counsel for plaintiff in error made a motion in the trial court to set aside the orders overruling these motions, and in support thereof presented affidavits tending to show that at the time plaintiff in error made his confessions or statements to Capt. Halpin which were taken down by the shorthand reporter he also at that time confessed that he was guilty of numerous other crimes which he claimed he had committed at various times and places during the ten or fifteen years previous, and that the court erred in not admitting in evidence his statement as to these other crimes, counsel contending that they would tend to show that the man was not sane. The court refused to vacate and set aside its orders overruling the motions for a new trial and in arrest of judgment on that ground. We do not think that the court's ruling should be held error. It is clear from the record that counsel for plaintiff in error not only acquiesced in the trial court shutting out all statements of plaintiff in error as to crimes other than the one here in question, but that his counsel requested that such rulings be made by the court. This evidence was not admissible as to the confessions of other crimes which the plaintiff in error confessed he committed, because they had no connection in any way with the crime in question. The

general rule is, that a statement in the nature of an admission or confession, in order to be admissible, must relate to the offense in question. While the fact that such statement may include another offense as well as that charged does not prevent the confession being received and going to the jury with proper instructions when there can be no separation of the relevant from the irrelevant parts, when the relevant parts can be separated from the irrelevant this must be done and that part, only, of the confession admitted which is material to the issues on trial. (1 Elliott on Evidence, sec. 293; 1 Greenleaf on Evidence,—16th ed.— sec. 218; 3 Ency. of Evidence, 324; 2 Wharton on Crim. Evidence,—10th ed.—688; see, also, *Commonwealth* v. *Wilson,* 186 Pa. St. 1, and *Gore* v. *People,* 162 Ill. 259.) The part of the confessions as to other matters was readily separable from that part of plaintiff in error's confession bearing on the crime here in question. °

Counsel for plaintiff in error further contend that prejudicial error was committed by allowing his picture to be taken while on the witness stand, pointing his finger at the jury. This objection was first urged on the motion to set aside the orders overruling motions for new trial and in arrest of judgment. On the hearing of this question in the court below the trial judge stated positively that he was not present when the picture was taken. The affidavits both for and against this motion, and evidence taken in open court, bear out this statement. There is some controversy in the record as to whether any or all of the jury were present in the room when the picture was taken. The court refused to set aside the orders overruling the motion for new trial and in arrest of judgment on this ground. Even if it be conceded that the picture in question was taken in the presence of all the jury during a recess of the court, we cannot see how plaintiff in error would be prejudiced thereby.

One of the principal contentions of counsel for plaintiff in error is that the evidence tends to show that he was insane and therefore not responsible for the crime. No direct evidence was offered by either side as to the sanity of plaintiff in error. Every man is presumed to be sane, and in the absence of evidence which may raise a reasonable doubt of his sanity no evidence need be introduced. Whenever the question of sanity is put in issue by facts coming from either side which may raise a doubt of the defendant's sanity, it then devolves upon the People to establish his sanity. (*Montag* v. *People*, 141 Ill. 75; *People* v. *Casey*, 231 id. 261, and cases there cited.) As we have said, no evidence was offered on this question, but counsel for plaintiff in error contend that plaintiff in error's actions and statements during the trial indicate that he was not of sound mind. While practically every witness was testifying for the State plaintiff in error interrupted, saying something in the presence of the jury,—usually some comment on what the witness had said or on the witness' character for truth and veracity. He also made such comments frequently as to the statements of counsel on both sides and the statements of the court made in the rulings. He more than once said to witnesses, "You lie;" "You lie right there;" "You lie from your heart." At other times he made the statement, "Let him tell what I told him." Again, "You don't know anything else; that's the kind of a guy you are; tell your troubles to the jury; come up there and tell them all I told you." Again, to a witness, "Now, you have been dreaming; you have been reading the paper, and what you read in the paper you tell them." Again, "That is all right; I want the jury to know the truth." Frequently he said to witnesses, "You are a bone-head," or "You are a pin-head." He made this same sort of a comment with reference to the State's attorney and to his own attorney. Again, as to a witness who seemed to satisfy him, "That's all right; that young lady knows everything she says; it's

the plain truth; it's the only one that got up and said the plain truth; the rest of them are a pack of liars." Near the close of the introduction of evidence the State's attorney asked if he could have a little time for consultation, and plaintiff in error broke in: "Go out and get a few more guns and a few more shots and it will be all right. Go out to the ladies. You see they have a sign up there, 'Justice.' For two bones they string him up there and you will have a nice necktie party out there next week, and you are all invited out there. I will tell you all about the fifty murders they have got me down for—fifty of them. Drink their blood. Just kill them for their blood—nothing else. You are all right. Every one of these murders was commited for about two dollars, like that guy here. He got two bones for the hammer. They can't prove that she was shot, and yet they want to prove I hit her with a hammer. Anything that anybody says, that is all right; just tell it to the jury."

These are only a few examples of the many interruptions that were made by plaintiff in error during the trial and will serve to illustrate the character of those interruptions. He was treated with great consideration by court, counsel and witnesses. As stated, when he took the stand he answered practically every question asked him by both his own counsel and counsel for the People, "I don't know." When, however, he was asked by the court why sentence should not be pronounced against him he made a long statement, which, while somewhat rambling, shows clearly that he did know and remember all about the various things he was questioned about on the witness stand. Conceding for the purposes of this case, but without attempting to discuss or decide the question, that his actions during the trial were proper to be taken into consideration by the jury in deciding whether or not he was sane, we can reach no other conclusion from this entire record than that the jury were fully justified in finding, from the evidence, that he was

a sane man. The court gave certain instructions asked by each side on the question of the insanity of the accused. We see no error in these instructions or any conflict, as urged by counsel for plaintiff in error, between two of them that would in any way tend to mislead the jury. Depravity of character and abandoned habits are not in themselves evidence of insanity. Neither is the commission of an un-natural or atrocious crime necessarily such evidence. *Hill* v. *Hill,* 27 N. J. Eq. 214; *State* v. *Stark,* 1 Strobh. 479; *In re Giteau,* 10 Fed. Rep. 161; *Wickes* v. *Walden,* 228 Ill. 56; *Snell* v. *Weldon,* 239 id. 279.

In this connection counsel for plaintiff in error argue that the court should have required the calling of expert witnesses on the question of the insanity of plaintiff in error, claiming that such experts were present in court during most of the trial. Even if this question were properly preserved in the record, no error was committed in not calling such experts.

Counsel further contend that the court erred in permitting the State's attorney to have another lawyer assist him in the prosecution of the case; that the defense was overmatched in the presentation of the questions to the jury, as plaintiff in error had only one attorney. We agree fully with counsel that it is the duty of the trial court, as well as of this court, to, see to it that every person charged with crime is given a fair trial. It appears from this record that when plaintiff in error was first arraigned in the trial court and stated that he was without counsel the court appointed two reputable attorneys of DuPage county to defend him; that shortly thereafter Anton Zeman, one of the counsel in this court for plaintiff in error, was made sole counsel on Spencer's own request, the other two attorneys theretofore appointed by the court withdrawing from the case. We find no error in this regard.

We have considered all the questions raised, directly or indirectly, by counsel. The evidence fully justifies the ver-

dict, and shows not only that plaintiff in error committed the crime with which he is charged, but that he was sane then and at the time of the trial. He has had a fair trial. No reason is found in this record why the finding of the jury should be set aside. The judgment of the circuit court will therefore be affirmed.

The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and five o'clock in the afternoon on the 31st day of July, 1914, as the time when the original sentence of death entered in the circuit court of DuPage county shall be executed. A certified copy of that order will be furnished by the clerk to the sheriff of DuPage county.    *Judgment affirmed.*