## COURT OF APPEALS,

January 4, 1910.

## THE PEOPLE v. CARLO GIRO.

(197 N. Y. 152.)

(1). MURDER—INDICTMENT OF TWO DEFENDANTS, ONE COMMITTING MURDER, WHILE BOTH ATTEMPTING BURGLARY.

Defendant and another broke into a dwelling house for the purpose of robbing it. While engaged, one in robbing, the other in watching, they were discovered, and a struggle ensued, during which several shots were fired by defendant and his confederate, one of which killed an occupant of the room where the defendant was first seen. *Held*, that the defendant and his confederate were conspirators engaged in the commission of a felony, that they were engaged in a common crime, and the homicide was within the common purpose. Both were principals throughout and what one did both did in the eye of the law. If either fired the shot that resulted fatally, both are equally guilty of murder in the first degree, and upon the facts the verdict of guilty is well supported by the evidence.

(2). SAME—CONFESSION.

The rules governing the admission of primary and secondary evidence to establish a contract have no application to the confession of a crime. When a contract in writing is made there is a meeting of minds and the written words are conclusively presumed to embrace the final agreement, to the exclusion of all that was said before. In making a confession, however, there is no meeting of minds and all that the accused voluntarily wrote, or said, or signed, which is material to the charge, is competent against him, because it is his own admission and against his own interest. If there is any exception to this general statement it is where a confession is made upon a hearing before a magistrate, who reduces it to writing and makes it a part of his return, pursuant to the command of the statute.

(3). SAME.

A confession was made by defendant after he had been warned that it might be used against him, the substance of which was taken down in writing, read over to defendant, who stated that it was true, and it was signed by him. This paper was read in evidence. A person.

present was also allowed to testify as to part of the statement made by defendant. *Held,* that the oral and written confessions were both competent.

APPEAL from a judgment of the Supreme Court, rendered October 8, 1909, at a Trial Term for the county of Kings, upon a verdict convicting the defendant of the crime of murder in the first degree.

The indictment contains two counts, each charging the defendant, Carlo Giro and one Frank Schleiman, jointly, with the crime of murder in the first degree. The first count alleges the killing of Sophie L. Staber by them while they were engaged in committing a felony, to wit, the crime of burglary. The second count sets forth the crime in the common-law form with reference to the same person and at the same time and place. During the trial of the defendant Giro, which is now before the court for review, the district attorney when requested to elect on which count he intended to proceed, announced that he chose the first, relating to homicide while engaged in the commission of a felony.

The homicide occurred on the 8th of July, 1909, the indictment was filed on the twelfth of the same month, the trial was commenced on the fifth of October following, and the next day a verdict of guilty of murder in the first degree was rendered. Judgment of death was pronounced on the eighth of October and the appeal therefrom was argued on the 16th of December, 1909.

The further material facts are stated in the opinion.

*Hector McG. Curren* and *Otto G. Foelker* for appellant. The verdict was against the weight of evidence and justice requires that a new trial be granted. (*People v. Place,* 157 N. Y. 594; *People v. Harris,* 136 N. Y. 453). The conversation between Giro and Schleiman, in which they both made admissions adverse to themselves, was elicited from then under duress. (*Peo-*

THE PEOPLE v. CARLO GIRO.

*ple v. Kennedy,* 159 N. Y. 346; *People v. McCallum,* 103
N. Y. 588; *People v. Quinn,* 123 App. Div. 682; *People v.
Chapleau,* 121 N. Y. 266). The assistant district attorney's
narrative of Giro's confession should have been excluded as it
was secondary evidence. (*People v. Corey,* 148 N. Y. 476).

*John F. Clarke, District Attorney,* for respondent. The de-
fendant's confession was voluntary and properly admitted in
evidence. (*People v. Randazzio,* 194 N. Y. 148; *People v.
Meyers,* 162 N. Y. 357). There is abundant evidence, both
direct and circumstantial, corroborating the defendant's confes-
sion. (*People v. Brasch,* 193 N. Y. 46). The law applicable
to this case was properly stated to the jury. (Wharton on
Homicide [3d ed.], §§ 418, 421, 428, 430; *Ruloff v. People,*
45 N. Y. 213; *Cox v. People,* 80 N. Y. 500; *Dolan v. People,*
64 N. Y. 485; *People v. Greenwald,* 115 N. Y. 520; *People v.
Flanagan,* 174 N. Y. 356).

VANN, J.:

On the 7th of July, 1909, George Staber was living with his
wife and children at No. 455 East 18th street, in Flatbush, a
suburb of Brooklyn. His family consisted of himself, then 62
years of age, his wife, Sophie L. Staber, aged 59, his son Ed-
ward, a young man of 24, and two daughters, whose ages do
not appear. They all retired at about eleven o'clock, after lock-
ing up securely in the usual way. Mr. and Mrs. Staber and
Edward slept on the second floor, and the daughters on the
third. The second floor consisted of a chamber, three bed-
rooms, a bathroom and a hall four feet wide, with stairways
leading therefrom to the first and third floors. The rear bed-
room, at the end of the hall, was occupied by Edward, while
his father and mother slept in the next room, which was separ-
ated from the bathroom by a partition six or eight inches thick.

17

All these rooms opened into the hall, and the doors were all open on the occasion in question. The stairway leading from the hall to the floor below was nearly, but not quite opposite the door opening from the hall into the room of Mr. and Mrs. Staber.

According to the testimony of Mr. Staber, he was awakened at about three o'clock in the morning and felt that some one was in his room. As he called out, " Who is there ? " he saw two men, one of whom, the defendant Giro, sprang to his bedside, flashed an electric light in his face, and holding a revolver at his head, said, " Keep quiet. We want your money." At this time, the other man, the defendant Schleiman, was ransacking the drawers of a bureau which stood against the wall near the foot of the bed. Mrs. Staber slept on the side of the bed next to the door and Giro, as he covered Mr. Staber with his revolver, stood at the bedside leaning over her. Schleiman kept on working at the drawers, and let something fall which made a noise, when Maude, one of the daughters, who slept on the floor above, called out, " Father, what is the matter ? " Mr. Staber, with the revolver at his head, dared not answer, but he coughed, when Giro in a threatening manner told him to hush. The daughter continued her outcry and soon Edward shouted, " Maude, I am coming." At that instant Giro jumped away from the bed and rushed through the door into the hall and Mr. Staber heard a scuffle in the direction of the bathroom followed by two shots. He also heard the voices of two men and recognized the voice of his son as one of the men engaged in a struggle in the bathroom. Schleiman, who in the meantime had left the bureau and had gone to a closet in the corner diagonally opposite the door of the bedroom, when the two shots were fired, turned and shot across the bed toward the door and immediately ran out of the room. Mr. and Mrs. Staber were still lying in bed unharmed by the three shots which thus far had been

fired, and as Schleiman left their bedroom Mr. Staber rushed to the back window and called for help. As he did so he heard his wife say, " Oh, Eddie," referring to her brave son who was fighting next door in defense of the family, and as he turned around he saw her jumping from the bed and heard the scuffle still going on in the bathroom. At once two shots were fired in quick succession from the hall into the bedroom and Mrs. Staber fell with her head against the bureau and her feet from twelve to fifteen inches inside of the door. She neither spoke nor moved, but died almost instantly. When these shots, the fourth and fifth, were fired the struggle was still going on in the bathroom. After his wife fell Mr. Staber heard two or three shots ring out in the hall.

According to the story of Edward, the son, he was awakened at about three o'clock by hearing his sister cry, " Help, police, murder." He pumped out of bed and ran to the door, when an electric light was flashed in his eyes which almost blinded him, but he tried to catch hold of something and caught a man around the neck. The man held a flashlight in his right hand and fired a revolver from his left, the bullet passing through the pajamas of Edward and stopping in the bedclothes of his bed. The shot set his pajamas on fire, but he tore them from his back, and, grappling with the man, turned him around, when he shot again, the bullet landing in the door jamb. Edward shoved the man into the bathroom and threw him down so that he fell on his knee and left hand, and in doing so dropped the revolver. Edward grabbed it, and there was a struggle for its possession, but he kept it, and, seeing a flash in the hall, fired at the flash. The man then bent down and ran from the bathroom. Edward followed him out, and hearing a noise as of some one falling on the stairway leading to the first floor, leaned over the banister and fired down into the darkness in the direction of the noise. He then heard his father

say, "Mother is shot," and at once went to his mother's room, where he found her dying. The man whom he had been struggling with in the bathroom was the defendant Giro, and the defendant Schleiman, when arrested a few hours later, had two bullets in his body.

The surgeon who made the autopsy found that a bullet had entered the right shoulder of Mrs. Staber, and, passing through both lungs, had lodged under the left shoulder blade. There were five powder grains within an area of three inches about the hole where the bullet entered. The doctor testified that Mrs. Staber was in normal health and that the wound would have caused death in one or two minutes.

Both defendants were arrested within a few hours after the homicide, Giro at No. 875 Utica avenue, in the outskirts of Brooklyn, and Schleiman, where he was lying in some bushes about 150 feet from said avenue. A bag containing a pocket-book and a pair of eye glasses belonging to Mrs. Staber, which were kept in the bureau that was ransacked, were found buried under a light covering of earth about twenty-five feet from the spot where Schleiman was arrested. He had a fresh bullet wound in his left leg and another in his right arm.

It was conclusively proved that the Staber house had been forcibly entered by breaking through the cellar door, apparently with a jimmy, found on the spot, which fitted fresh marks on the door and also on a window, through which an entry had been attempted. The door and window were intact the night before. Blood was found in the vestibule leading from the first floor of the house to the kitchen, which was not there when the family retired that night. The defendants had flashlights as well as rubber bulbs, filled with ammonia, which could be squirted into the face for the purpose of blinding and strangling with its fumes. The revolver, a five-shooter, which Edward took from Giro during their struggle, when examined after the

tragedy, was found to hold one loaded shell and four that had been fired. The other revolver was not found.

The Penal Code provides that the killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed in any of several ways, and among them " Without a design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise." (§ 183).

The evidence warranted the jury in finding, and they are presumed to have found, that Giro and Schleiman were conspirators, engaged in the commission of a felony, when Mrs. Staber was killed. They armed themselves in advance, and in the dead of night took with them to the Staber house flashlights, ammonia bulbs and a jimmy, which are the peculiar, if not the exclusive, implements of burglars. Acting together, they broke into the house for the purpose of robbing it, and were engaged, one in robbing and the other in watching, when discovered. All that they did was in furtherance of their original design to rob the house, and what they did to save themselves and escape was as much a part thereof as breaking in with the jimmy or stealing the pocketbook. When they armed themselves to enter upon a felonious undertaking, shooting was the natural and probable result in order to get away if discovered, and if either fired the fatal shot, both are responsible. From the beginning to the end they were engaged in a common crime, and the homicide was within the common purpose. Both were principals throughout, and what one did both did in the eye of the law. A shot fired by either under the circumstances disclosed by the evidence was the act of both, whether their minds met in the act of shooting or not, provided they met in the act of committing the burglary. That fundamental fact carried with it the heavy responsibility which the law places upon all who are acting together in the commission of a felony, when

one of their number kills an outsider even by shooting to frighten and not to take life. If either defendant shot Mrs. Staber and caused her death, both are qually guilty of murder in the first degree. (*Ruloff v. People*, 45 N. Y. 213, 216; *People v. Flanigan*, 174 N. Y. 356, 367; Wharton on Homicide [3d ed.], § 418).

The evidence also authorized the jury to find and they are presumed to have found that one of the defendants killed Mrs. Staber while, acting in concert, they were committing a felony. The evidence of Mr. Staber and his son warrants that conclusion. All the shots were fired by one or the other of the defendants, except the two fired by Edward, which did not hit Mrs. Staber, but hit Schleiman, for they were found in his body. The three shots first fired did no harm to Mrs. Staber for she was still lying in bed untouched after the reports were heard. The sixth and seventh did not touch her, for they hit Schleiman. The fourth and fifth were fired directly into the bedroom from the hall just as she got out of bed, and at that time Edward and Giro were still fighting in the bathroom, four feet from the door. There were but two revolvers, one in the bathroom, where Edward and Giro were struggling for it so far inside that a bullet therefrom could not have reached the bedroom of Mrs. Staber, and the other was in the hands of Schleiman, who left the bedroom with it in his possession and who, as the jury could have found upon sufficient evidence, hearing Mr. Staber call from the window for help, turned around and fired to silence the call and hit Mrs. Staber. The case was clearly for the jury, and their verdict is well supported by the evidence, independent of the confession which will be noticed presently.

The charge was full and fair and no exception was taken thereto. All the requests of the defendant's counsel were charged, including the following: " I ask your honor to charge

the jury that notwithstanding the fact that the prosecution has proved beyond a reasonable doubt that the defendant Giro and the defendant Schleiman were confederates, it still rests upon the prosecution to prove beyond a reasonable doubt as to whether either of these two defendants shot Mrs. Staber."

Soon after his arrest Giro volunteered to make a statement in the police office, and after he had been duly warned that whatever he said might be used against him, gave his version of the tragedy at some length. Only certain policemen were present when he began his statement, but before it was finished, Mr. Elder, the assistant district attorney, arrived, and after the warning had been repeated, asked Giro some questions and the answers were taken down by an officer in narrative form as part of the statement. No artifice was used, no promise or threat made, no hope held out and so far as appears all that Giro stated was wholly voluntary. After the statement was completed the officer who took it down, carefully read it in full to him and he said it was true and signed it.

Upon the trial the written confession was read in evidence, except certain portions thereof relating to the antecedents of both defendants, which were excluded. The defendant's counsel argues in support of his objection and exception to the ruling admitting the confession, that it was incompetent, because the officer who took the statement did not take it all literally but, as to a part thereof, only the substance. The officer testified that " the most of the statement is verbatim; " and that when Mr. Elder came in and asked questions the witness wrote down what he thought Giro " said or meant," " the sense of it," as he could not write shorthand.

A witness who cannot give a conversation literally is permitted to state the substance thereof and this is what the officer did in reducing a portion of Giro's statement to writing. A more conclusive answer, however, is that the statement as writ-

ten, or in the words of the officer " every word there is in it," was read to Giro, who said that it was true and signed it.

Mr. Elder was allowed to testify under objection and excep-tion to the questions asked by him after his arrival and the answers made by Giro thereto. It is argued that the latter should have been excluded as secondary, but both confessions, the oral and the written, were equally competent, though not equally valuable, for a person may forget while a writing can-not change.

The rules governing the admission of primary and secondary evidence to establish a contract have no application to the con-fession of a crime. When a contract in writing is made there is a meeting of minds and the written words are conclusively presumed to embrace the final agreement, to the exclusion of all that was said before. In making a confession, however, there is no meeting of minds and all that the accused voluntarily wrote, or said, or signed, which is material to the charge, is competent against him, because it is his own admission and against his own interest. It may be in the form of a letter, or of several letters to different persons, or may consist of de-tached conversations with many people, or it may be a formal confession, or all of these together, yet all are admissible for the prosecution, upon the principle that no one will voluntarily make an admission against himself unless it is true. If there is any exception to this general statement it is where a con-fession is made upon a hearing before a magistrate, who re-duces it to writing and makes it a part of his return pursuant to the command of a statute, but that is not this case. (1 Green-leaf on Evidence, § 227; *Wright v. State*, 50 Miss. 332; *Reg. v. Weller*, 2 C. & K. 223; *Rex v. Walter*, 7 C. & P. 267).

The oral confession did not differ in substance from the writ-ten statement as far as the latter went, but it was more com-plete. Both confessions were in substantial accord with the

testimony of Mr. Staber and his son, and they were also corroborated strongly by the circumstantial evidence in the case.

We have examined the other questions argued by the learned counsel for the defendant, and all the rulings in the record whether excepted to or not, but we find none to require or justify a reversal.

The judgment of conviction should be affirmed.

CULLEN, Ch. J., GRAY, EDWARD T. BARTLETT, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.