30339. CAWTHON *v.* THE STATE.

498

DECIDED MAY 25, 1944.   ADHERED TO ON REHEARING JULY 29, 1944.

*Sam Kimzey*, for plaintiff in error.

*Hope D. Stark, solicitor-general, J. B. G. Logan,* contra.

MACINTYRE, J.   The defendant was convicted of an assault with intent to murder upon Farris Brewer, the sheriff of Banks County, and his son, Verner Brewer.   His motion for a new trial was overruled, and he excepted.   The testimony of the sheriff and his son was to the effect that they, along with Ernest Mason, were riding in the sheriff's car down the State highway which runs between Baldwin and Homer, Georgia; that Verner Brewer was driving the car, that the sheriff was sitting on the front seat beside him, and that Mason was sitting on the back seat; that an unidentified Ford automobile passed them and proceeded on down the highway; that this car was traveling at a lawful rate of speed; that they followed it along the highway; that it then turned off of the highway into the Middle River Road, and they followed it within a distance of forty feet down the Middle River Road for approxi-

mately two miles without making any sign for the car to come to a stop; that after following it for that distance they pulled up to within eight or ten feet of its rear bumper and turned their spotlight on the car and sounded the siren; that the car went on some fifty to one hundred yards before it stopped; that the siren and spotlight were on constantly from that time until the car stopped; that during this time the sheriff's son had the spotlight all over and in the car; that they pulled up on the left of the car (within four or five feet alongside of it); that just as their car stopped and the sheriff put his hand on the handle of the door to open it in order to get out, Fleming, the driver of the other car, ran the glass window down and leaned over the steering wheel; that this opened the way for the defendant, who was sitting on Fleming's right, to get on his knees on the seat and shoot a loaded shotgun twice into the sheriff's car, wounding both the sheriff and his son; that the front of the sheriff's car lacked "14 or 15 inches" of being even with the front of the other car, and that the sheriff's son had the spotlight turned on the inside of the other car, when the gun was fired. The sheriff's son who was operating the spotlight said that the defendant was the man who did the shooting, and that Fleming was driving the car. The sheriff said that he had no warrant to search the automobile, nor any warrant for the arrest of either of the two occupants of the car. He testified, in effect, that he had drawn no gun, made no menacing gestures, and used no threatening words—that he only wished to question the occupants of the car. "I was not trying to search them. I would have gotten a warrant if they had denied me searching it. I had not gotten out of the car. I had not opened the door. I had not spoken a word." His son testified, in part: "I figured that the man doing the shooting ought to have known that we were officers and not hold-up men. I don't know what they thought. We drove behind them a mile or two, and during that time we were flashing the spotlight all around that car and in the car and on the tires and tag. We did not turn the siren on for some distance. I don't know what the occupants of the car thought about —whether they were going to be robbed instead of it being officers of the law after them. We had given them no other notice than the blowing of the siren that we were officers of the law; what other notice could we give them?" Ernest Mason, the third party in

500

the sheriff's car, testified that the spotlight on the sheriff's car was being manipulated so as to throw the light on and in the other car, and that he could identify the defendant and Fleming, as being the two persons in the car, and that the defendant was the man who did the shooting. He also testified that he was in the hospital when the officers brought the defendant in the room where the sheriff's son was a patient; that he did not remember whether the sheriff's son said that he could not recognize the defendant; that he did not tell them that he recognized the defendant; that they did not ask him, but that as a matter of fact he did recognize the defendant; that he figured that the sheriff would tell them; that it was about the time the sheriff came home from the hospital that he told him that he recognized Mr. Cawthon as the man who shot him. "I did not try to arrest anybody in that automobile. I did not try to search them. I never got out of the car until the shooting." Eugene Hollis, a sergeant of the Georgia State Patrol, testified, in part: "I read a statement to the defendant on trial that was transcribed by me at the dictation of Fleming and signed by Fleming, and which I witnessed, along with Sheriff Bell. I read the entire contents—read it to the defendant, Cawthon." The statement is as follows:

"Statement of Louis Fleming. February 12, 1943, 9:10 p. m. Statement of Louis Fleming in regards to Farris and Verner Brewer shooting on February 1st, 1943, in Banks County. I came to T. O. Cawthon's home in Franklin County on Monday night about seven or seven-thirty p. m., and picked him up, and he put his shotgun in my car, and we went to Habersham County by Toccoa, Ga. We returned back through Baldwin and turned through Baldwin and turned on the Middle River Road, and we turned in this road and about a mile this car pulled up and blowed his siren, and we pulled over to the right and nearly stopped, and they threw their spotlight in my face, and they never got out, and we thought that we was being hijacked. So T. O. Cawthon said, 'I will stop them;' so he reached and got his shotgun and shot out of the left glass of my car back of me two times into the other car, and I did not know who the occupants of that car was. I later learned that this car was occupied by Sheriff Brewer and his son and a man, Mr. Mason. We left the scene of the shooting, and T. O. Cawthon said, 'The sheriff is a good friend of mine.'

We traveled county roads all of the way, except for about a mile on the Lavonia and Carnesville road, and we turned to the right and went near T. O. Cawthon's home and he got out and left me, and I then went home, and as soon as I got home I took the tag off of my car and laid it up on the plate on the front porch. This statement is being made on my free will and accord, without hope of reward. Louis Fleming. Witness A. W. Bell, sheriff, Hall County, Ga., Eugene Hollis, Sergeant Ga. State Patrol, Gainesville, Ga."

"When the foregoing statement was read to him [which is the equivalent of saying, 'I made the foregoing statement, not only in his presence, but to him'], Cawthon said: 'What in the hell did you all do to that boy?' . . The statement [by Fleming] was made freely and voluntarily. I transcribed it according to what he told me to put down. I went with Mr. Fleming then in the presence of Mr. Cawthon and read this to Mr. Cawthon and let Mr. Cawthon read it. Mr. Fleming was present at that time. It had been signed and witnessed at that time. Mr. Fleming signed it twice, once on each page. That (indicating) is his signature there and there. As to what Mr. Cawthon said and did when this statement was read to him, he was sitting on the bed and he grabbed the bed like this and said: 'What in the hell did you all do to that boy?' He was the most nervous man I have ever seen. He was in a perfect jerk all over. He never did deny what was said in this statement." A. W. Bell, sheriff of Hall County, testified: "I had occasion to talk to each of these men several times while they were there in jail. Mr. Fleming made a statement in the presence of Mr. Cawthon as to how this shooting took place. His statement was made freely and voluntarily. This [referring to the paper] is the statement that Fleming made there in jail. After this statement was written out, we sent down and brought Mr. Cawthon up. We brought him up to where Fleming was in my room. The statement was made in my presence. Sergeant Hollis wrote it out. He wrote it out at the dictation of Mr. Fleming. I saw Mr. Fleming sign it. I witnessed it; he signed it on both pieces of paper. We insisted that Fleming read it. The statement was read in the presence of Mr. Cawthon. Fleming's statement was transcribed by Mr. Hollis. This (indicating) is the transcript here. It was read to him, Mr. Fleming, by Hollis, and then he read it, and we

sent for. Cawthon, and Cawthon read part of it, and then Hollis read it to him, and we was all there in the room. We read it to Cawthon. As I remember, it was first handed to Cawthon. Every detail, I wouldn't remember. After Cawthon heard it read he made a statement. He made it freely and voluntarily. He turned to Fleming and said: 'What did they do to you to make you tell it?' Fleming told him, 'you know that's not all of it, that's not near all of it.' Cawthon got as nervous as any man I ever seen, he grabbed the side of the bed and walked over to the side of the window and said: 'If I was to admit shooting an officer, it would be dangerous for me to ride the highways of this county.' He did not make any denial of it at that time; that is all he said at that time. Cawthon told me that he and Sheriff Brewer were good friends and he would like to get in touch with him. I talked to Cawthon a half dozen times. He said the sheriff was a good friend of his and he had known him a good while, and he could arrange things if he could see the sheriff. I asked him about employing Mr. Goode as counsel. They told me he had been up there and tried to hire Mr. Goode for Mr. Fleming. Well, the Chief of Police told me they had tried to hire Mr. Goode, and I went in and asked Mr. Cawthon about it. I asked Cawthon: 'If you did not know anything about this, why were you trying to hire George Goode at Toccoa?' He told me he carried a load of pecans up there, and he knew George Goode very well, and he had heard about this and he wanted to talk to him about this while he was up there, and I asked him didn't he try to employ him and he said, 'yes,' but he found out that he was a cousin of Mr. Brewer and he would not take his case. Well, at that time he was in jail. That was before he was arrested. When I was talking to Mr. Cawthon before the statement was made by Mr. Fleming, Cawthon said he did not think that he knew the fellow at all; he claimed he did not know Fleming. He told me he might know the boy, but he doubted seriously whether he knew him or not. It seemed like he had heard of him, but he did not know him at all. He did not deny as to the statement being true. He denied [at all other times] the fact that he had anything to do with the shooting all along. Cawthon told me when he first came into the jail that he 'did not know a damned thing about the shooting of the sheriff of Banks County.' He repeated that statement,

and told me that from time to time for the eight or eleven days he was in jail. He said he was not along, and did not know anything about what happened. But when I told him certain things he decided he did." The defendant pleaded an alibi; but in his statement he said: "I know Farris Brewer well and know his automobile, and if I'd a been in that automobile I wouldn't a shot his automobile or let anybody else shoot it." The defendant also introduced two witnesses whose testimony, if true, tended to support the alibi. However, the jury seemed to have disregarded his statement as to the alibi, as well as the witnesses' testimony, which they had a right to do.

■ The jury were authorized to find that the sheriff did not intend to search the automobile, if the occupants had required a search warrant so to do, without first obtaining such a warrant; nor was he attempting to make a search or to arrest the defendant, without complying with the requirement for a legal arrest as provided in section 27-207 of the Code. The jury were authorized to believe all of the defendant's statement or to believe any part of it, or to disbelieve all of his statement or disbelieve any part of it. The defendant, in his statement to the jury, pleaded an alibi. Yet he said: "I know Farris Brewer [the sheriff] well, and know his automobile, and if I had been in that automobile, I wouldn't have shot his automobile or let anyone else shoot it." The evidence authorized the jury to find that the defendant was the person in the other car who shot into the sheriff's car, wounding both the sheriff and his son. Hence, the evidence and a part of the defendant's statement, when taken together, authorized the jury to find that the defendant knew that the car that signaled him to stop by blowing the siren and flashing the spotlight was the sheriff's car, and that as both cars stopped, he fired a loaded shotgun twice in quick succession into the sheriff's car, without provocation, at a distance of less than fifteen feet, and wounded both the sheriff and the sheriff's son, which specific facts, if so found, authorized the jury to infer a specific intent to kill. The evidence authorized the verdict of an assault with intent to murder. *Chandler* v. *State*, 54 *Ga. App.* 334 (4) (187 S. E. 856); *Griffin* v. *State*, 50 *Ga. App.* 213 (177 S. E. 511); *Jackson* v. *State*, 56 *Ga. App.* 374 (192 S. E. 633).

■ The reading of the written statement of Fleming by the officer to the defendant, in the presence of Fleming, which, in part, stated that Fleming was present when the defendant fired the shots into the sheriff's car, was the equivalent of Fleming stating to and in the presence of the defendant, that the defendant had done the shooting, and when the defendant did not deny it, a question was raised whether the circumstances required an answer or a denial, or whether the defendant's failure to deny, or his other conduct, amounted to an admission. *Emmett* v. *State*, 195 *Ga.* 517 (2) (25 S. E. 2d, 9). In Tyler *v.* State, 159 Miss. 223 (131 So. 417), it was said: "The appellant insists that it was error for the lower court to allow the witness Furnace to testify orally as to the confession heard by him, which confession was at the time taken. down in writing and signed by the accused, taking the position that the written confession was the only evidence admissible, and that parol evidence of a confession taken down in writing was incompetent. On this question the appellant was advised that there was a written confession during the preliminary examination. After the witness Furnace had testified orally as to the confession, and another witness had been heard, the appellant made a motion to exclude the parol evidence of Furnace regarding the confession, on the ground that the confession was in writing. However, if we say in this case, for the sake of the argument, that the point was preserved in due time, what is the particular rule to be applied in such a case? . . We are of opinion that parol evidence of a confession which is taken down in writing extrajudicial is not secondary evidence. It may be that the written evidence would be more convincing and of greater weight, but that is not the determining factor. The written confession is primary evidence, and the oral testimony of a witness who recollects a confession is likewise primary evidence. It is not on a parity with contracts and other written documents where the minds of the parties must meet. Neither is the extrajudicial statement on a parity with those records and statements which are required by law to be kept in writing or reduced to writing. The authentic written contract is the best evidence of the meeting of the minds of the parties and ought not to be changed by parol evidence, except in exceptional circumstances, unnecessary here to repeat; and likewise a statement required to be committed to writing by law becomes authenticated,

becomes a record, and is then denominated the best evidence. We find the rule which we prefer to adopt aptly stated in the case of People *v.* Giro, 197 N. Y., 152 (90 N. E. 432), wherein on this question that court said: 'The rules governing the admission of primary and secondary evidence to establish a contract have no application to the confession of a crime. When a contract in writing is made there is a meeting of minds, and the written words are conclusively presumed to embrace the final agreement, to the exclusion of all that was said before. In making a confession, however, there is no meeting of minds, and all that the accused voluntarily wrote, or said, or signed, which is material to the charge, is competent against him, because it is his own admission, and against his own interest. It may be in the form of a letter, or of several letters to different persons, or may consist of detached conversations with many people, or it may be a formal confession, or all of these together, yet all are admissible for the prosecution, upon the principle that no one will voluntarily make an admission against himself unless it is true. If there is any exception to this general statement, it is where a confession is made upon a hearing before a magistrate, who reduces it to writing and makes it a part of his return pursuant to the command of a statute, but that is not this case. . . 'The oral confession did not differ in substance from the written statement as far as the latter went, but it was more complete.' . . The extrajudicial confession, whether in writing or oral, if freely and voluntarily made, is admissible in evidence, and the oral statement of what the accused said, as well as the written confession signed by him, was clearly alike primary evidence. There was no error on the part of the court in this behalf." In State *v.* Coy, 140 Kan. 284 (36 Pac. 2d, 971), Thiele, Justice, speaking for the court, said: "The question of admissibility of a stenographic record was discussed in the case of Wright *v.* Wright, 58 Kan. 525 (50 Pac. 444), wherein objection was made to the court stenographer reading from his typewritten transcript of notes taken at a former trial, when he stated he could not testify from memory. The typewritten translation was refused and error was alleged in such refusal. On appeal, this court said: 'The rule of many of the older cases was that a witness might refresh his memory, as to forgotten matter about which he was called upon to testify, by reference to a memorandum of the

same made at the time or very soon thereafter; having done which,. he might then testify; but in such case his testimony must be from memory and not from the memorandum. The liberalizing tendency of the courts has now enlarged the rule so as to include cases where the witness is still unable to testify from memory, after an examination of the memorandum, but is able to identify such memorandum as made by himself, at or near the time of the transaction to which it relates, for the purpose of preserving a true account of it, and that he knows it to have been truly and correctly made. In such cases he may give the contents of the memorandum as his own evidence.' And further the court said: 'Can there be any doubt that the notes of an official court stenographer are memoranda which fall within the rule above quoted? We think not. . . Were it possible to write the testimony of witnesses in longhand, as it is delivered by them, no question could be raised as to the right of a witness who had correctly recorded it to read to the jury, although all memory of it had passed from his mind. . . The stenographer in this case testified that he had correctly taken the testimony of the witness Wright; and the fact that he had no independent recollection of such testimony after reading his notes, does not preclude him from giving to the jury what he knew to have been correctly done at the time it was performed.' . . In the last-cited case it was held that where the county attorney's stenographer testified she had correctly taken down and transcribed testimony at a preliminary hearing, it was competent for her to read the transcript. This was in effect testifying that she had made a memorandum of Belknap's testimony as he gave it, and from the memorandum was able to swear to what he had said.'"

In People v. Spencer, 264 Ill. 124 (106 N. E. 219), it was said: "The second time the plaintiff in error made a statement as to his connection with this crime to Capt. Halpin it is claimed by his counsel that this statement was taken down by a shorthand reporter and afterwards transcribed into typewriting. It is admitted that it was not signed by the plaintiff in error. Counsel, however, contend that the oral testimony of Capt. Halpin and others as to what was stated by plaintiff in error was incompetent,—that only the typewritten statement should have been admitted. This is not the law. · Even if the statement, after it had been written out, had been admitted to be correct by plaintiff in error and signed by

him, still the oral testimony of those who heard his statement would have been admissible. The oral or written statements—either or both—under these circumstances are competent. If there is any exception to this general rule it is where the confession is made upon a hearing before a magistrate, who reduces it to writing and makes it a part of the record pursuant to some statute. 1 Greenleaf on Evidence (16th ed.), § 227; People v. Giro, 197 N. Y. 152, and cases cited; see, also, Guy v. State, 9 Tex. Crim. App. 161; State v. Wells, 1 N. J. L. 424 [1 Am. D. 211]."

In the instant case the witness Hollis testified orally to the same facts contained in the written extrajudicial statement made by the codefendant Fleming in the presence of the defendant Cawthon, for the witness gave the contents of the writing (memorandum) as his own testimony by reading it (or by quoting it) to the jury while he was on the stand testifying. It should be especially noted that the writing was not an official document or record; it was simply a memorandum or writing signed not by the defendant but by another and read in the presence of and to the defendant, and upon the failure of the defendant to deny it, the jury were authorized to find that it was an admission.

In these circumstances it was permissible for the officer, a witness, to state or read to the jury, while testifying, what had been said or read in the presence of the defendant, under the circumstances shown in the evidence. The question thus presented is not one of primary and secondary evidence, for the contents of the writing here in question do not put in issue the reciprocal rights and duties of the parties to a written contract, and the rule in regard to parol evidence to establish a contract has no application. The reading of Fleming's statement by the officer to the defendant, while Fleming was present, and without any denial of its contents by the defendant, was the equivalent of Fleming making the statement in the defendant's presence. Thus the narrative reading or quoting of Fleming's statement by the witness as a part of his oral testimony was not error. Moreover, the testimony concerning the contents of the affidavit was more favorable to the defendant than aliunde testimony concerning the same subject-matter without objection. Special ground 1 is not meritorious.

■ We think special ground 2 is controlled adversely to the defendant by the rule stated in *Kalb* v. *State,* supra, to wit: "Acqui-

escence or silence, when the circumstances require an answer or denial or other conduct, may amount to an admission. When a statement tending to incriminate a person is made in his presence and he remains silent, the mere fact that he is under arrest or is in custody at the time will not render evidence of such statement and silence inadmissible as an implied admission, or make it improper to instruct the jury in reference to such evidence."

■ The solicitor-general, in his argument to the jury, used the following language: "If the defendant in this case was not along the night of the shooting, he should have put up the other co-defendant to prove that they were not together that night." Defendant's counsel objected to this argument on the ground that "the remarks were not referable to any evidence adduced upon the trial of the case, and were not authorized by any evidence in the case, and were prejudicial to the defendant," and moved for a mistrial. There was testimony in the record which tended to show that Fleming was a codefendant with Cawthon, and that Fleming had stated in the presence of the defendant that the defendant "was along" the night of the shooting. However, Fleming had subsequently made an affidavit that this statement was untrue; that it had been obtained by duress on the part of the officer; and that in truth, "he was not along." The officer denied that there was any duress. There was testimony by other witnesses for the State that Fleming "was along" the night of the shooting. The defendant pleaded an alibi. All reasonable latitude should be allowed attorneys in their argument to the jury on the facts and on inferences and deductions sustained by the evidence. It is not necessary that they be logical. False logic does not call for objections, rebukes, or mistrials. It is the introduction of facts not in the record which requires the application of such remedies. *Cammons* v. *State* and *Brooks* v. *State,* supra. We are of the opinion that the argument of the solicitor-general was not improper, and that the court did not err in refusing to grant a mistrial.

*Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*