THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
COLLEEN IRBY, Also Known as COLLEEN MACKENZIE, Appellant.

Second Department, February 27, 1978

## APPEARANCES OF COUNSEL

*Nicholas A. Sordi, Jr.,* for appellant.

*Denis Dillon, District Attorney (Martin I. Saperstein* and *William C. Donnino* of counsel), for respondent.

## OPINION OF THE COURT

SHAPIRO, J.

This is an appeal by defendant from a judgment of the County Court, Nassau County, rendered December 6, 1976,

convicting her of murder in the second degree, burglary in the second degree, grand larceny in the second degree, possession of burglar's tools, possession of a weapon in the third degree and unlawful possession of noxious materials, upon a jury verdict, and imposing concurrent sentences as follows: an indeterminate term of 15 years to life on the murder count, up to 10 years on the burglary, up to 5 years on both the larceny and weapons possession felonies, a definite term of one year on the charge of possession of burglar's tools, and an unconditional discharge on the charge of possession of noxious materials. We affirm.

### THE INDICTMENT

By indictment dated December 26, 1975, the Grand Jury of Nassau County, charged the defendant, Colleen Irby, also known as Colleen MacKenzie, with the following acts:

(1) second degree murder of Police Officer Giglio, i.e., felony murder in the course of, and flight from, the burglary of Thelma J.'s Boutique; (2) burglary in the second degree by aiding John MacKenzie, who was armed, in the burglary of Thelma J.'s Boutique; (3) grand larceny in the second degree; (4) possession of burglar's tools, i.e., aiding John MacKenzie, who possessed a screwdriver and pliers; (5) two counts of possesion of a weapon in the third degree, i.e., aiding John MacKenzie, who possessed two loaded firearms; (6) unlawful possession of noxious materials, i.e., aiding John MacKenzie, who possessed a can of "Mace". All of those alleged acts occurred in the early morning hours of October 7, 1975, in Nassau County.

### THE FACTS

Detective Thomas Gulla, of the Nassau County Police Department, testified to the basic background facts leading to the burglary and fatal shooting, which account had been given to him by the defendant. Testimony was likewise received from Lorraine Mait, the proprietor of Thelma J.'s Boutique, as to her initial encounter with the defendant. Integrating the testimony results in the following account emerging: defendant and John MacKenzie drove from Florida to New York City on about September 24, 1975 "to visit some friends of theirs" in Bayside, Queens. After the first few nights, the couple settled in at the Hempstead Motor Hotel. On the

afternoon of Saturday, October 4, 1975, as the couple drove past Thelma J.'s Boutique, a woman's clothing store, defendant stated: "I like that black dress. Can we stop? I want to look at the sizes." MacKenzie parked the car and, according to defendant, he said to her: "Come on, we are going in the back way. We can do anything any way we want to do in New York City." The defendant resisted, stating: "No, honey, for once do it my way."

They entered the boutique, which is located near the intersection of Hempstead Avenue and Locust Street, through the front door. The bathroom of the boutique has a window which looks out onto the rear parking area. The window was covered by "wooden slats" as well as glass. The defendant went into the fitting room of Thelma J.'s to try on some clothes, but MacKenzie was not in sight when she came out. Ms. Mait informed the defendant that MacKenzie had asked to use the bathroom. According to Mait, MacKenzie was there for about 10 minutes. The defendant went back to the fitting room and when she again came out, MacKenzie was standing by "the front window, front door" and he had picked out a blouse for her to try on. Although she did not buy anything she had seen, she did buy the blouse picked out for her by MacKenzie. MacKenzie and the defendant then left the store without incident.

In her statement, given after complete *Miranda* warnings, the defendant said that on the afternoon of October 6, 1975 she and MacKenzie went into Manhattan, where he purchased an ankle holster for his gun; that she remained outside the store while MacKenzie bought it, and she was not aware of what he had bought, notwithstanding the fact that she put the bag into her purse. Later, in the early hours of the morning of October 7, the couple decided to get something to eat and defendant changed her clothes into "a dark grey sweater * * * blue jeans and sneakers." They drove to a place called the Yellow Brick Bar; when they arrived MacKenzie told her to stay in the car while he looked for a man named Ronnie MacKenzie. MacKenzie returned a short time later and they drove around, finally backing into an alleyway and turning out the lights. When defendant asked MacKenzie what he was doing, he allegedly replied: "Don't I always take care of you? Don't worry about nothing." He then added: "I got some business here." Defendant then stayed in the car "to play chickie for [MacKenzie]", i.e., to "watch for the cops or watch

for anybody" while MacKenzie broke into the back window of what turned out to be Thelma J.'s Boutique.

After entering the boutique, MacKenzie started "throwing some stuff out the window" and yelled out: "Put the stuff in the car." Defendant was putting the clothes which had been thrown out of the window into the trunk when she saw a light go on across the street. Meanwhile MacKenzie went back into the store and "she notice[d] a pair of headlights in a gas station across the street." Defendant then left the car and hid behind some trash cans in the alleyway. A police car pulled into the alleyway and a police officer shone a flashlight at her. She then got up and walked over to the police officer, who asked her: "What are you doing here?" She replied: "I'm looking for my cat * * * My cat, my calico cat." The police then asked her for some identification and she presented an address book, but her name was not in it. Before this transpired, the defendant had placed, in neat and orderly fashion, 240 ladies' blouses, 16 pants suits, 16 ladies' coats, an adding machine, and a typewriter in the trunk. According to the defendant, while she was being questioned, MacKenzie yelled to her to "run"; she thereafter heard a shot. The officers immediately ran around to the front of the store, *with her following behind them,* and in the ensuing confusion, she ran away.

The record further makes it clear that what had happened was that the burglary had been interrupted by Police Officer Hofknecht, who, at about 2:30 A.M., while on motor patrol, observed a Cadillac in the alleyway behind the row of stores. As Hofknecht pulled into the alleyway, he saw the Cadillac "move a little bit or * * * bounce". He used his flashlight, but saw no one in the car. He did see an open window in the back of the boutique, and requested assistance. At that point a bystander, one Michael Burns, informed Hofknecht that he "saw or heard someone banging at the front door of Thelma J.'s dress shop". The officer told Burns to go across the street to the Power Test gas station, and "yell" if he saw anyone run out of the front of the store. At about that time Hofknecht, and his partner, Police Officer Hayes, spotted the defendant behind the Cadillac and near the trash cans in the driveway. She came forward out of the shadows. Hayes also observed the open window and "a garment laying underneath" it. Also at about that time Officer Matthew Giglio (the officer who was killed) pulled up to the front of the store in a police ambu-

lance, answering Hofknecht's call for assistance. Hayes and Hofknecht asked Giglio to watch the front of the store. The officers asked defendant what she was doing there. She replied that she was looking for her calico cat. *The entire questioning lasted from one to three minutes.*

During that time Michael Burns was watching the front of the store from a gas station across the street. He was soon joined by Louis Ewanitsko. They both observed Officer Giglio at the store's entranceway. They then observed MacKenzie leave the store and saw Officer Giglio approach him. At this point their accounts differ slightly. Burns observed Giglio place his hand on MacKenzie's shoulder. Burns did not see a gun in Giglio's hands. Suddenly MacKenzie turned, faced Giglio and shot him. Giglio dropped to the ground and MacKenzie ran. Ewanitsko stated that when Giglio approached MacKenzie, MacKenzie kept moving; MacKenzie then turned, fired a shot and Officer Giglio dropped to the ground. When they reached Giglio, the officer's gun was still in his holster. Further, they had not heard whether Officer Giglio told MacKenzie that he was under arrest. Ewanitsko testifed that the shooting occurred as Officer Giglio attempted to push MacKenzie up against the front wall.

Officers Hayes and Hofknecht heard a shot and a groan. Both officers ran to the front of the store and the appellant fled. Sgt. Ulshafer, who had just arrived, gave chase, but lost her. Meanwhile, stricken Officer Giglio was taken to the hospital, where he remained until he died in December, 1975.

Shortly after the shooting, the Nassau County Police conducted an extensive dragnet. The defendant's description was circulated by the police to the various motel attendants in the area. At approximately 4:45 A.M. Benjamin King, the attendant at the Hempstead Motor Hotel, West Hempstead, found the defendant attempting to gain entry into the motel. King, at defendant's insistence, called the police, who arrived at about 5:00 A.M. and took her into custody.

Police Officers Di Paola, Block and Budd arrested the defendant in the motel lobby. As they approached her, she said "I didn't mean to do it. I don't want to get in trouble." The defendant was placed into a police vehicle and given her fourfold *Miranda* warnings, which she said she fully understood. The police wanted to know the identity and whereabouts of her male accomplice. The defendant responded

that she and MacKenzie had been forced at gunpoint to do the burglary by an unknown white male.

The defendant was transported to the police mobile command bus situated at Thelma J.'s. Once there she was turned over to Detectives Gulla and Curran. Detective Gulla again gave her the fourfold *Miranda* warnings, which she said she completely understood. She indicated that she would talk to Detective Gulla without an attorney being present. The defendant then repeated the story she had given the arresting officers to the effect that she and MacKenzie had been forced to commit the burglary. Detective Gulla replied that defendant was lying; that he had witnesses to show otherwise and that she should tell the truth. The defendant then gave Detective Gulla an oral statement. She now claimed that she had not known that MacKenzie was armed and that he forced her to participate in the burglary by slapping her. Her oral statement was reduced to writing and signed by her.

While being questioned, the defendant identified certain articles recovered at the crime scene, to wit, a bent screwdriver, gloves and a can containing mace, as belonging to MacKenzie. She also admitted that she, too, had possessed mace.

### THE LAW

### I. *Did the trial court commit error in its charge as to the requisite elements of felony murder?*

Defendant contends:

(1) The question of whether a felony murder occurred "*during* the commission of the underlying felony is virtually always a *question of fact* for the jury" (emphasis in original); that is to say, the question of whether the underlying felony had been terminated by either defendant's or MacKenzie's temporary police custody so as to sever the subsequent homicide as to defendant, is also a question of *fact* for the jury.

(2) The trial court refused to charge this question and a review of its charge indicates that "[n]owhere does the Court advert to the *factual* questions required to be resolved by the jury in determining whether or not a 'felony murder' took place" (emphasis in original).

(3) A *fair question* as to this issue was presented, inasmuch as defendant was in temporary police custody just prior to the shooting and this could conceivably have both terminated the underlying felony and severed the felony murder connection

and that, therefore, the failure to so charge constituted a fundamental denial of the right to a fair trial.

Under the facts in this record, we reject the defendant's contentions. The question of *when* the underlying felony ends, so as to sever its connection with a subsequent murder, and what a trial court must charge as factual considerations was, quite recently, considered by the Court of Appeals. In *People v Gladman* (41 NY2d 123, 127-129) (decided after the trial in this case) the court made the following observations (the initial paragraph refers to cases decided before the present Penal Law came into existence in 1967):

"The later New York cases indicate some dissatisfaction with the strict legal rules that had developed *and tended to leave the question of escape killing to the jury as a question of fact,* under appropriate instructions. The change was to point out 'generally that the killing to be felony murder must occur while the actor or one or more of his confederates is engaged in securing the plunder or in doing something immediately connected with the underlying crime *(Dolan v. People,* 65 N. Y. 485); that escape may, under certain unities of time, manner and place, be a matter so immediately connected with the crime as to be part of its commission *(People v. Giro,* 197 N. Y. 152); but that where there is no reasonable doubt of a complete intervening desistance from the crime, as by the abandonment of the loot and running away, the subsequent homicide is not murder in the first degree without proof of deliberation and intent. *(People v. Marwig,* 227 N. Y. 382).' *(People v Walsh,* 262 NY 140, 148, *supra; People v Jackson,* 20 NY2d 440, 454, cert den 391 US 928.) The question of termination of the underlying felony was then left to the jury as a fact question. *(People v Jackson, supra.)* * * *

"*The 1967 Penal Law limited the application of the felony murder concept to nine serious and violent predicate felonies. At the same time, it was provided that the doctrine would apply to a killing committed in 'immediate flight'. This change was intended to do away with many of the old technical distinctions relating to 'abandonment' or 'completion'.* (See Hechtman, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law, § 125.25, p 400; Gegan, Criminal Homicide in the Revised New York Penal Law, 12 NYLF 565, 589.)

"*Under the new formulation, the issue of whether the homicide occurred in 'immediate flight' from a felony is only*

*rarely to be considered as a question of law for resolution by the court. (People v Carter,* 50 AD2d 174, 176.) *Only where the record compels the inference that the actor was not in 'immediate flight' may a felony murder conviction be set aside on the law. Rather, the question is to be submitted to the jury, under an appropriate charge. The jury should be instructed to give consideration to whether the homicide and the felony occurred at the same location or, if not, to the distance separating the two locations. Weight may also be placed on whether there is an interval of time between the commission of the felony and the commission of the homicide. The jury may properly consider such additional factors as whether the culprits had possession of the fruits of criminal activity, whether the police, watchmen or concerned citizens were in close pursuit,* and whether the criminals had reached a place of temporary safety. These factors are not exclusive; others may be appropriate in differing factual settings. If anything, past history demonstrates the fruitlessness of attempting to apply rigid rules to virtually limitless factual variations. No single factor is necessarily controlling; it is the combination of several factors that leads to a justifiable inference." (Emphasis supplied.)

Prominent in the court's analysis in *Gladman* is *People v Carter* (50 AD2d 174, 176), where the Third Department stated: "'It is possible to have a factual situation in a case of felonious homicide where *only one conclusion* can be drawn as to whether or not the homicide took place during the commission of the felony' *(People v Walsh,* 262 NY 140, 147). Generally, however, the matter is a fact question and only rarely may it be decided by the trial court as a matter of law *(People v Walsh, supra,* p 147; cf. *People v Jackson,* 20 NY2d 440, 454; *People v Sobieskoda,* 235 NY 411, 420; *People v Nichols,* 230 NY 221)" (emphasis supplied).

In the oft-cited case of *People v Walsh* (262 NY 140, 147-148), which was decided under the stricter felony murder rule in force before the adoption of the "immediate flight" statute in 1967, we find the following relevant language: "It is possible to have a factual situation in a case of felonious homicide *where only one conclusion can be drawn* as to whether or not the homicide took place during the commission of the felony. There have been such cases in this court * * * It should have been left to the jury under instructions pointing out generally that the killing to be *felony murder must occur while the*

*actor or one or more of his confederates is engaged in securing the plunder or in doing something immediately connected with the underlying crime"* (emphasis supplied). Thus, ordinarily, whether the homicide occurred in furtherance of the felony, or in "immediate flight" therefrom, is a question for the jury; however, the conclusion to be drawn might be one of law depending upon the circumstances of the case. In his statement to the jury, the Trial Judge read the language of the indictment as to the felony murder charge, i.e., "the defendant Colleen Irby * * * aiding and abetting and being aided and abetted by John MacKenzie * * * on or about October 7, 1975, committed the crime of burglary, and in the course of and in furtherance of such crime, and in immediate flight therefrom, caused the death of Matthew Giglio, a nonparticipant in the crime * * * [specifically, in] the immediate flight therefrom, John MacKenzie shot Matthew Giglio". The trial court then explained that:

"In deciding whether a felony murder has been committed, it makes no difference whether the shooting actually occurred in the course of or in the furtherance of the burglary alleged, or whether it occurred in the immediate flight therefrom.

"The elements of the crime of murder in the second degree under this count of the indictment are:

"(1) that at the time and place set forth in the indictment the defendant either acted alone or with one or more person, each aiding and abetting the other, committed or attempted to commit a burglary.

"(2) That in the course of and in furtherance of the burglary, or of the immediate flight therefrom, the defendant, or another participant in the crime, caused the death of Matthew Giglio.

"(3) That Matthew Giglio was not a participant in the underlying crime of burglary.

"If you are not satisfied that the People have proven each and every element beyond a reasonable doubt, then you must find the defendant not guilty of murder in the second degree."

Before he delivered his charge, *and in the absence of the jury,* the Trial Judge indicated that he would not comply with a defense request to charge, in so many words, that a factual question had been raised as to whether the underlying felony had been terminated as to defendant by virtue of either her or MacKenzie having been placed in custody prior to the shoot-

ing of Giglio by MacKenzie. The defendant argues that this was, per se, reversible error, and that what the trial court did was in effect to determine, as a matter of law, that the underlying felony had *not terminated.* Her argument is fallacious.

■ The trial court did *not* determine that the homicide had occurred during the course of the burglary as a matter of law; rather, it left the question to the jury to decide. Implicit in the reading of the *indictment* and the charge, including the statutory definitions, is the fact that the jury was *completely free* to find that the felony murder connection had been severed and hence that the murder did not occur "in furtherance of the burglary, or of the immediate flight thereform." Thus, the question of participation, termination and immediate flight was actually given to the jury to decide. The trial court did *not* affirmatively charge that defendant's participation in the burglary did *not* end until she fled the scene or that the jury must *assume* that the underlying felony had not terminated. While the charge could have been more detailed in explaining the attributes of felony termination and "immediate flight", the trial court did, in fact, leave it to the jury to consider these questions, *which defense counsel himself fully and without objection raised in summation.* In his summation counsel contended that the underlying felony, as well as defendant's "immediated flight", had terminated prior to the homicide. He said:

"Now, when the shot is heard, you must remember that *my client is under arrest for two to three minutes before that shot was fired* * * * Now, her participation, if there were any participation, *is over. She is no longer free to go anyplace or do anything.* * * *

"Now, his Honor will charge you, what is felony murder. There are terms in it concerning the immediate flight of somebody. But you must remember that flight must terminate sometime. I merely say that *you can conclude that it terminates when a police officer arrests somebody.* * * *

"Termination. Remember that *if the burglary is terminated* and no longer going on, *and MacKenzie's flight from the burglary is terminated* and no longer going on, *there can be no felony murder because they go together.* No burglary, no flight, no felony murder. * * *

"Was the burglary over? *My God, this girl was under arrest for two to three minutes.* John MacKenzie himself was under

arrest. *You are not free from anything if you are arrested.* And if you are, then crime never terminates, it goes on and on but that's not reasonable. *When it is over, it is over."* (Emphasis supplied.)

In joining issue on that subject, the prosecutor said: "During the course of his [Giglio's] attempt to arrest John MacKenzie or at least to stop and question John MacKenzie, he was shot and killed, and I submit to you that is flight, that when John MacKenzie saw the police officers in the back of the store, saw that Colleen was going to be captured, he went to the front of the store, and I submit that Michael Burns was standing across the street from the gas station and heard a banging noise, that at that moment was the precise time that Officer Hofknecht had made his first entrance into the rear of the store and that John MacKenzie either saw Officer Hofknecht or he was warned by Colleen Irby that there was a police car coming, and that at that point he went to the front of the store and he was attempting to flee, and that when he shot Officer Giglio he was in immediate flight from the commission of that burglary."

■ Clearly, in view of the extended argument by defense counsel and the prosecutor, immediately followed by the court's charge on that subject, the jury was made aware of the issues before it and its responsibility to decide them *(People v Early,* 59 AD2d 912, 913). It should also be noted that the defendant failed to except to the court's charge that "it makes no difference whether the shooting actually occurred in the course of or in the furtherance of the burglary alleged, or whether it occurred in the immediate flight therefrom", or to request a clarification or amplification of the meaning of those words. The question was thus not preserved for appellate review as a question of law (CPL 470.05, subd 2) and the proof in this record certainly does not warrant an entertainment of that question in the interest of justice.

■ Furthermore, there is an independent reason for concluding that the trial court's charge on felony murder was *not* erroneous. All of the cases on the subject, such as *Gladman, Carter* and *Walsh (supra),* stand for the proposition that in *some* cases, the trial court can properly determine, as a *matter of law,* that the felony had not terminated. *This is such a case.* Analyzing the record here, we find the following elements:

(1) the shooting occurred at the very scene of the burglary;

(2) the shooting occurred with the fruits of the crime in the trunk of the automobile and therefore at least in defendant's constructive possession;

(3) the defendant was never in custody but was merely questioned by the police for not more than three minutes. This fact is made unmistakably clear when it is recalled that there is no dispute that she was left unattended when the police heard the shot.

Under these circumstances to argue that the questioning of defendant by the police for at the most three minutes terminated her participation in the underlying felony and severed the felony murder connection is "a futile attempt to split into unrelated parts an indivisible transaction" *(People v Moran,* 246 NY 100, 104). No amount of intellectual quicksand reasoning can change the fact that successful escape is obviously contemplated as part of a felony endeavor and that although defendant did not shoot Giglio, she escaped in the course of the burglary and shooting.

The further contention urged by the defendant, that Mac-Kenzie was in temporary custody so as to sever *his* part of the felony, is belied by the record. MacKenzie was never in custody; the apparent and chilling ease with which he fatally wounded Officer Giglio makes this inescapably clear. To accept the defendant's narrow interpretation of the concept of a felony being committed in the course of the burglary or of "immediate flight therefrom" would do violence to the intent of the Legislature as evinced by the language of the statute (see Hechtman, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law, § 125.25, p 400). Thus, the court's charge on this issue which, in effect left the issue of "termination" and "flight" to the jury as a question of fact was more favorable to her than the record warranted.

Such cases as *People v Smith* (232 NY 239), cited in the dissent, are completely inapposite. In the first place *Smith* was decided before the present "immediate flight" statute was enacted and the question there was simply whether the burglary had terminated at the time of the shooting. The facts revealed that the defendant, while engaged in the commission of a burglary, was caught by and surrendered to the proprietor. There, the court noted (p 241), the "proprietor and his son took him into actual custody, searching him and taking from his possession various articles including a pistol, and thereafter placed him in a chair; that they still further consummated

their capture and custody of him by placing handcuffs upon him and again commanding him to be seated in a chair, which he did; that then the proprietor stepped to a telephone and the son stepped behind the counter, leaning his gun against the latter and the defendant sprang for and seized the gun which was discharged causing the death of the son and the defendant then, with an accompaniment of force, escaped from the store."

The Court of Appeals said (pp 241-242) that the charge in that case "in effect instructed the jury as a matter of law that the defendant was engaged in the commission of the crime of burglary until he left the store and that, therefore, he was engaged in the commission of such crime at the time the homicide occurred, and accordingly, might be convicted of murder in the first degree. Presence upon the premises was thus made conclusive evidence of continuance in commission of the underlying crime. This was the only theory upon which the case was left to the jury". It is thus clear that *Smith* is completely irrelevant to the factual situation now before us.

## II. *Did the trial court err in refusing to charge the affirmative defense of duress?*

The defendant argues that in refusing to charge the defense of duress (Penal Law, § 40.00), the trial court prevented her from presenting a crucial defense. This, says she, is particularly true since her original 6:20 A.M. statement and the 9:20 A.M. question and answer statement both indicate that she was coerced into helping MacKenzie by the latter's various threats.

██ The argument does not bear close scrutiny. It is well settled that the trial court's obligation to charge a particular factual question does not arise until there exists a minimal threshold of evidence which points to this conclusion and which would allow a reasonable jury to so determine (see, e.g., *People v Miles,* 23 NY2d 527, 540-541, cert den 395 US 948). This is particularly true with an affirmative defense, which the defendant must raise during the course of the trial, and prove by a preponderance of the evidence (cf. *People v Patterson,* 39 NY2d 288, 301, affd 432 US 197). Returning to the record, we find:

(1) The defendant acted as "chickie" or lookout for MacKenzie to forewarn him of the approach of the police;

(2) The defendant took the stolen goods and neatly stacked them in the trunk of MacKenzie's car:

(3) When the police car approached, the defendant hid behind the alleyway trash cans and emerged only when Officer Hofknecht shone his flashlight at her;

(4) Upon inquiry as to what she was doing there at 2:30 A.M., she gave the false and misleading answer that she was looking for her "calico cat";

(5) Upon the shooting, she fled; and

(6) Finally, whether the defendant lacked the subjective *intent* to aid and abet MacKenzie because he allegedly coerced and "smacked" her can only be determined by the *objective manifestations* of her actions; every single one of her actions was *unequivocally* and thoroughly referable only to an intent to aid and abet MacKenzie and demonstrated that she was not acting under the seige of "duress". Thus, the minimal threshold of evidence was not met in this case to warrant the charge. Hence the trial court quite properly refused to charge the defense of duress.

■ Regardless of that fact, however, there is a separate and more cogent reason to conclude that the trial court did *not* err in not charging duress. An examination of the record reveals that, out of the hearing of the jury, counsel engaged in a colloquy as to the introduction of evidence of other uncharged crimes on the issue of the defendant's intent. The prosecutor stated that since the defense counsel had alluded to defendant's "exculpatory" statements in his opening remarks, and that as the two statements in evidence also could conceivably be construed as supporting an affirmative defense of duress, the People would introduce evidence of other burglaries by defendant and MacKenzie to show criminal intent and lack of coercion on her part. Such evidence would have been properly admissible under the law set forth in *People v Calvano* (30 NY2d 199) and *People v Mann* (31 NY2d 253). At that point defense counsel steadfastly *refused* to state on the record that he was raising the affirmative defense of duress. He *again* refused to state that he was raising such a defense, even *after* the defendant *rested* and summations were about to commence. It was after the defense counsel repeatedly stated that he *did not know* whether he wanted the charge of duress that the trial court finally said it would *not* charge duress.

■ ■ ■ Under the circumstances of this case, the refusal to

charge the defense of duress was proper. It is now well settled that the affirmative defense of duress must be raised or asserted during the course of the trial in order to give the prosecutor a fair opportunity to rebut the evidence, or cross-examine any defense witnesses on that issue. Since the defendant flatly refused to state that she was relying on the defense of duress until after the court had charged the jury, it would have unfairly prejudiced the People to submit that issue to it since it was then too late for them to submit evidence on that issue (see *People v Mann, supra,* pp 260-261). This was a trial—a search for a just result—and not "a poker game in which players enjoy an absolute right always to conceal their cards until played" *(Williams v Florida,* 399 US 78, 82). In any event, it is clear that the court could properly have refused to charge duress because that defense "is not available when a person intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress" (Penal Law, § 40.00, subd 2).

We have considered the other issues presented by the defendant in her brief and find them to be without merit. The judgment appealed from should therefore be affirmed.

HOPKINS, J. (dissenting). The trial court failed to instruct the jury, as requested by the defendant, that if she was in custody at the time of the homicide, then she would not be guilty of felony murder, or that if she could no longer participate in the course of the burglary or in flight therefrom because she was in custody, then she would not be guilty of felony murder. The defendant's counsel excepted to the failure so to charge. Moreover, it is clear that the Trial Judge did not instruct the jury concerning the application of the elements of felony murder to the facts; nor to the effect of the detention or custody of the defendant on the charge of felony murder. Again, defendant's counsel took exception to the failure to instruct the jury in these respects.

The significance of this neglect becomes obvious when the request of the jury during deliberation for additional instruction concerning felony murder was followed by the court's mere repetition of the bare charge originally given, consisting in substance of a description of the indictment and the statutory definition of the crime. For a third time, the defendant's counsel *excepted to the failure to charge more fully.*

It is preeminently a jury question whether the conduct of the defendant and the action of the police in questioning her

at the time of the homicide constituted a termination or a suspension of the underlying felony so that the defendant might not be culpable of felony murder. "If anything, past history demonstrates the fruitlessness of attempting to apply rigid rules to virtually limitless factual variations. No single factor is necessarily controlling; it is the combination of several factors that leads to a justifiable inference" *(People v Gladman,* 41 NY2d 123, 129). Only rarely may the trial court remove the issue from the jury *(People v Carter,* 50 AD2d 174, 176). In many instances it is the defendant who claims that he is entitled, as a matter of law, to be exculpated from a charge of felony murder because of the circumstances. Here, on the contrary, it was the defendant who sought an instruction that the jury should consider whether the circumstances as a matter of fact could be found to represent a termination of the underlying felony.

True it is that the present Penal Law extends felony murder both to homicide in the commission of the felony and homicide occurring during immediate flight (Penal Law, § 125.25, subd 3). But the extension did not change the rule that the jury must usually determine as a question of fact whether the felony was terminated when the killing took place. Especially is this applicable when, as here, the person charged is not the killer, but an accomplice of the killer (see, e.g., *People v Donovan,* 53 AD2d 27, 33-34).

Certainly, the detention and questioning of the defendant by the police prior to the homicide were factual issues which the jury should have appraised. Custody of the defendant is properly a factor to be considered by the jury in determining whether the defendant was still engaged in the commission of the burglary at the time of the murder (see, e.g., *People v Smith,* 232 NY 239, 243; cf. *People v Walsh,* 262 NY 140, 147-149; *Coleman v United States,* 295 F2d 555, cert den, reh den 369 US 813, 842; *Commonwealth v Kelly,* 333 Pa 280). "Where, however, the felon kills someone during the felony, but in a separate and distinct act and to satisfy his own end, his accomplice in the felony is not guilty of murder in the first degree *(People v. Sobieskoda,* 235 N. Y. 411, 416, *supra)"* *(People v Wood,* 8 NY2d 48, 52).

We cannot at our position as appellate Judges make a judgment as a matter of law that the circumstances of the crime in this case compel the conclusion that the defendant was still engaged in the commission of the burglary when her

accomplice, attempting to escape from the front of the building, whether with or without the knowledge that the defendant was being detained and questioned by police in the rear, shot and killed the policeman. At the least, there are many inferences of fact which must be settled by the jury, and the defendant was entitled to a charge that the jury should consider the circumstances of her detention and questioning in determining whether she was at that time engaged in the course of the underlying felony.

I therefore dissent and vote for a new trial.

MOLLEN, P. J., and LATHAM, J., concur with SHAPIRO, J.; HOPKINS, J., dissents and votes to reverse the judgment and order a new trial, with an opinion.

Judgment of the County Court, Nassau County, rendered December 6, 1976, affirmed.